STATE of Indiana, Appellant–Plaintiff,

v.

James R. GLASS, Appellee–Defendant.

No. 21A01–0201–CR–43.

Court of Appeals of Indiana.

June 10, 2002.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellant.

Frederick Vaiana, Voyles, Zahn, Paul Hogan & Merriman, Indianapolis, Indiana, Attorney for Appellee.

## OPINION

VAIDIK, Judge.

### Statement of the Case

The State appeals from an order granting a motion to suppress evidence seized after James R. Glass was stopped by an officer responding to a dispatcher's call. The State contends that the officer was justified in relying upon information provided by the dispatcher to make the stop. Because the telephone call from an unnamed person did not in itself contain sufficient indicia of reliability, and because the police officer did not independently confirm the reliability of the caller or the salient information provided, we affirm.

### Facts and Procedural History

At approximately 1:30 p.m. on January 1, 2000, Connersville Police Officer Dana Fluery received a dispatch advising him of a "suspicious vehicle for reckless driving." Tr. p. 9. Accordingly to Fluery, dispatch knew the identity of the caller and "gave a description of the vehicle to be on the lookout for." Tr. p. 13. Officer Fluery found Glass driving the described vehicle in the 900 block of Eastern Avenue in Connersville. The officer followed Glass for approximately one block, but witnessed no traffic violations or inappropriate driving. Nevertheless, Officer Fluery activated his emergency lights. Glass stopped in the roadway, then followed Fluery's direction and drove into a nearby lot.

Officer Fluery approached Glass and requested his driver's license and vehicle registration. Glass produced a recently expired driver's license. Fluery observed that Glass was shaking and his eyes were bloodshot. At Officer Fluery's request, Glass exited his vehicle. After pulling himself out, Glass leaned against the vehicle, still shaking. He volunteered that he had a handgun in the vehicle and produced his permit. Officer Fluery asked if Glass had other weapons, and Glass responded in the negative.

When Fluery performed a pat down search, he felt a hard rectangular-shaped object in the front groin area of Glass's trousers. The officer "presumed it could have been, anything, it could have been a weapon or a knife." Tr. p. 12. Glass did not respond to questioning about the object, and he appeared more nervous to the officer. Through the top of Glass's trousers, Fluery "felt and [saw] a wooden box type object." Tr. p. 12. Fluery removed the box containing a green leafy substance

and a smoking device. Glass agreed to submit to a chemical test, and he was transported to the Fayette Memorial Hospital for a drug screen. Test results were positive for THC. Subsequent testing of the green leafy substance revealed the presence of marijuana or hashish.

The State charged Glass with possession of marijuana as a Class A misdemeanor,[1] reckless possession of paraphernalia as a Class A misdemeanor,[2] and operating a vehicle with a controlled substance or metabolite in his body as a Class C misdemeanor.[3] Glass moved to suppress all evidence, arguing that the detention and search occurred without reasonable suspicion. At the hearing on the motion, Officer Fluery testified he neither knew nor had worked with the person initiating the report. The caller did not testify and remains unidentified. Following the hearing, the trial court entered findings with its order granting Glass's motion to suppress.

The State filed two motions to reconsider, both of which were denied. Upon the State's motion, the trial court dismissed the case. This appeal followed.[4]

### Discussion and Decision

 The State challenges the order granting Glass's motion to suppress. In the suppression hearing, the State had the burden of demonstrating the constitutionality of the measures it used to secure evidence. *State v. Ashley*, 661 N.E.2d 1208, 1211 (Ind.Ct.App.1995). In order to prevail on appeal, the State must show that the trial court's ruling on the suppression motion is contrary to law. *State v. Smith*, 638 N.E.2d 1353, 1355 (Ind.Ct.App. 1994), *reh'g denied*. This court accepts the factual findings of the trial court unless they are clearly erroneous. *Williams v. State*, 745 N.E.2d 241, 244 (Ind.Ct.App. 2001). In reviewing the trial court's decision, we consider the evidence most favorable to the ruling together with any adverse evidence that is uncontradicted. *State v. Dodson*, 733 N.E.2d 968, 970–71 (Ind.Ct.App.2000), *reh'g denied*.[5]

 At issue in this case is an investigatory stop. The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" by the Government, and its safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citations omitted). However, a police officer may briefly detain a person for investi-

1. Ind.Code § 35–48–4–11(1).

2. Ind.Code § 35–48–4–8.3(c).

3. Ind.Code § 9–30–5–1(b) (recodified at 9–30–5–1(c)).

4. The State appeals under Indiana Code § 35–38–4–2(5), which authorizes the State to appeal the trial court's suppression of evidence where the suppression effectively precludes further prosecution. *State v. Morris*, 732 N.E.2d 224, 226 n. 1 (Ind.Ct.App.2000).

5. The State asserts that, because it is appealing from a negative judgment, this court considers only the evidence most favorable to the judgment. We recognize that nearly identical language is found in a number of our cases. *See State v. Estep*, 753 N.E.2d 22, 25 (Ind.Ct. App.2001); *State v. Eichholtz*, 752 N.E.2d 163, 164 (Ind.Ct.App.2001); *State v. Harris*, 702 N.E.2d 722, 726 (Ind.Ct.App.1998); *State v. Farber*, 677 N.E.2d 1111, 1114 (Ind.Ct.App. 1997), *trans. denied; State v. Ashley*, 661 N.E.2d 1208, 1211 (Ind.Ct.App.1995); *State v. Smith*, 638 N.E.2d 1353, 1355 (Ind.Ct.App. 1994), *reh'g denied*. However, omitting uncontradicted adverse evidence from our analysis is inconsistent with the "totality of the circumstances" approach articulated in *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), discussed *infra*. Accordingly, we utilize the standard set forth in *Dodson*, 733 N.E.2d at 970–71.

gatory purposes without a warrant or probable cause if, based upon specific and articulable facts together with rational inferences from those facts, the official intrusion is reasonably warranted and the officer has a reasonable suspicion that criminal activity "may be afoot." *Terry v. Ohio*, 392 U.S. 1, 21–22, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (quoted in *Francis v. State*, 764 N.E.2d 641, 644 (Ind.Ct.App. 2002)).

Cases recognize that reasonable suspicion is a "somewhat abstract" concept, not readily reduced to "a neat set of legal rules." *Arvizu*, 122 S.Ct. at 751 (citations omitted). When making a reasonable-suspicion determination, reviewing courts examine the "totality of the circumstances" of the case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id.* at 750 (citation omitted). The reasonable suspicion requirement is met where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Francis v. State*, 764 N.E.2d 641, 644 (Ind.Ct.App. 2002). We review the trial court's ultimate determination regarding reasonable suspicion de novo. *Arvizu*, 122 S.Ct. at 751; *Williams*, 745 N.E.2d at 244.

Here, the trial court granted the motion to suppress based upon our decision in *Washington v. State*, 740 N.E.2d 1241 (Ind.Ct.App.2000), *trans. denied.* In *Washington*, an anonymous informant reported a possible drunk driver to the Lafayette State Police Post. The informant, whose identity and reliability were unknown, advised that the driver was in a black and white Cadillac with a particular license plate number traveling southbound on Interstate 65. An off-duty police officer received the call and stationed himself at the roadside. When the Cadillac passed, the officer followed the car for approximately one-half mile and verified the license number. Without observing any evidence of drunken or erratic driving, the officer stopped the Cadillac. In concluding that the officer did not have reasonable suspicion to stop the car, we held:

> [A]n anonymous telephone tip, absent any independent indicia of reliability or any officer-observed confirmation of the caller's prediction of the defendant's future behavior, is not enough to permit police to detain a citizen and subject him or her to a *Terry* stop and the attendant interruption of liberty required to accomplish it.

*Id.* at 1246 (ending footnote deleted).

The State disputes the relevance of *Washington*, and argues instead that *State v. Eichholtz* governs this case. 752 N.E.2d 163 (Ind.Ct.App.2001). There, Lenny Thatch was driving southbound on Meridian Street in Indianapolis when he observed a driver of a white Le Baron pull onto the street. The second driver repeatedly crossed the centerline into the northbound lanes and repeatedly drove onto the curb on the right side of the road. While following the car, Thatch called 911 and reported the erratic driving. In addition to the car's description, Thatch gave the dispatcher the car's license plate number and its location. Thatch also provided his name and described his own vehicle. Thatch remained on the line until a police officer arrived. The officer observed Thatch's car following a Le Baron bearing the reported license plate number. Without having witnessed any erratic driving or traffic violations, the officer stopped the Le Baron.

Our court recognized that, unlike the anonymous informant in *Washington*, Thatch identified himself to the 911 opera-

tor in such a manner that he could have been held legally responsible if he had filed a false police report. *Id.* at 167. We also pointed out that the police officer was able to confirm specific information about both cars and their location. *Id.* Thus, we held that the officer had reasonable suspicion to conduct the stop without having personally confirmed the erratic driving. *Id.* at 168.

The reasonable suspicion inquiry is determined on a case-by-case basis. *Francis,* 764 N.E.2d at 644. Thus, neither *Washington* nor *Eichholtz* directly controls the case before us. Nevertheless, we examine the facts presented in light of those cases.

 In contrast to *Washington,* the dispatcher here knew the identity of the caller. Although we cannot discern if Officer Fluery also knew the caller's identity, an investigative stop may be based upon the collective information known to the law enforcement organization as a whole. *See Kindred v. State,* 524 N.E.2d 279, 292 (Ind. 1988) (discussing probable cause, but citing *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) for application of rule in the context of reasonable suspicion). Even if we impute such knowledge to Officer Fluery, however, the trial court merely found that "the police knew the name." Appellant's App. p. 64. Unlike in *Eichholtz,* the identity of the caller was never verified. Further, the caller's reliability was unknown.

Generally, information gleaned from a telephone caller differs from that obtained in a face-to-face encounter. In the latter situation, a trained officer has the opportunity to assess credibility and motive by observing facial expressions and subtle body language. *See, e.g., Bogetti v. State,* 723 N.E.2d 876 (Ind.Ct.App.2000) (holding that a *Terry* stop was warranted where a person reported directly to a police officer at a restaurant that a driver who had just left in a white semi-truck "may be intoxicated"). Here, at the time of the stop, Fluery did not know whether the caller was a concerned citizen, a prankster, or an imposter. Further we cannot discern whether the caller identified himself in such a way as to place his credibility at risk or as to subject himself to criminal penalties.

In *Eichholtz,* the police officer visually confirmed that the caller was following the alleged offender and, thus, could reasonably have observed errant driving patterns. No such confirmation occurred in this case. The fact that a named caller with an untested reputation called the police does not in itself establish reasonable suspicion.[6]

We next review the content and reliability of the information offered by the caller. The transcript shows that Officer Fluery was not permitted to recount the dispatcher's exact words. He merely testified that the dispatcher "gave a description of the vehicle" allegedly driving recklessly, which at some point he "found." Tr. p. 13.

---

6. In drawing this conclusion we are cognizant of our supreme court's statement: "Where police officers in the street act in good faith reliance on a dispatch from their own or another police agency that a crime has been committed, there is no need to show the source of the dispatcher's information or the reliability of the dispatcher's informant." *Moody v. State,* 448 N.E.2d 660, 663 (Ind. 1983). To the extent the quoted language suggests that every call to a dispatcher is sufficient in itself to satisfy the Fourth Amendment, it paints Fourth Amendment jurisprudence with too broad a brush. *See Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (holding that police officer did not have probable cause for a warrantless arrest based upon a state police bulletin originating from an informant's tip).

Without more, we cannot determine whether Fluery identified Glass's vehicle based upon the color and make of the car, its age, its license plate, its location or direction of travel, a description of the occupant, or a combination of those factors. Nor can we determine the elapse of time between the dispatch and Fluery's identification of the vehicle.

Although the police may have possessed more information, we must base our decision on the record before us. The State merely showed that the caller described a car sufficiently to permit Officer Fluery to identify a similar vehicle. The officer followed the vehicle for about one block without observing any driving irregularities. Officer Fluery did not personally observe facts to verify the reliability of the caller or the reliability of any significant information provided by the caller.[7] To the extent that the caller predicted future conduct, it did not occur.

Reasonable suspicion requires more than conjecture. On the record created, the State has not demonstrated that Officer Fluery had an objective and articulable suspicion that Glass had committed, was committing, or was about to commit legal wrongdoing. The investigative stop violated Glass's Fourth Amendment rights. The trial court's decision to suppress evidence seized was not contrary to law.

By our decision today, we do not intend to discourage citizens from reporting incidents involving driving irregularities. With the advent of cell phones, drivers quickly can call police to initiate timely investigation and possible prevention of death or injury. The responding state ac-

tion, however, must comply with the dictates of the Fourth Amendment.

Judgment affirmed.

RILEY, J., and MATTINGLY–MAY, J., concur.

---

**7.** The State directs us to Glass's statement that he had passed a car that then followed him into Connersville. According to the State, Glass's testimony shows the information provided by the caller was based upon personal observation. Our concern today, however, is not with Glass's knowledge at the time of the stop but, rather, with Officer Fluery's knowledge. *Francis*, 764 N.E.2d at 644. Fluery did not mention having seen the caller's vehicle.