v.

**STATE of Indiana, Appellee–Petitioner.**

**No. 49A02–0909–JV–841.**

Court of Appeals of Indiana.

April 22, 2010.

Rehearing Denied July 28, 2010.

---

**54**

David Pardo, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

L.W. appeals his adjudications as a delinquent child for committing Burglary, as a Class B felony when committed by an adult, and Theft, as a Class D felony when committed by an adult. L.W. raises several issues on appeal, but we address a single dispositive issue, namely, whether police had reasonable suspicion to conduct an investigatory stop of him under the Fourth Amendment to the United States Constitution.

We reverse.

### FACTS AND PROCEDURAL HISTORY

On May 28, 2009, at approximately 10:00 p.m., Ebony Chisolm notified police regarding a burglary at her residence in Indianapolis. Chisolm had left home at approximately 8:30 p.m. that evening, and when she came home, she found an open window and a broken interior door. Missing from Chisolm's home were jewelry, money, a video game system, and a plastic water jug full of change.

Shortly thereafter, Lawrence Police Department Officer Tracy Cantrell was patrolling the area. In the meantime, a man who identified himself as Brandon Shockley called police and reported that the burglary suspect was a "tall black male wearing [a] black shirt and black shoes." Transcript at 19. Dispatch relayed that tip to Officer Cantrell. When he was driving approximately two blocks away from Chisolm's house, Officer Cantrell saw a pedestrian, later identified as L.W. Officer Cantrell thought that L.W. "fit [the suspect's] description to a 'T'", so he stopped his car and approached L.W. Officer Cantrell said to L.W., "Hey, come here." *Id.* at 20. L.W. stopped, but, according to Officer Cantrell, L.W. "looked like he wanted to run but he didn't." *Id.* So Officer Cantrell ordered L.W. to get down on the ground, and L.W. complied.

Officer Cantrell helped L.W. stand up again and he asked him where he had come from. L.W. replied that he had just been playing basketball at his cousin's house. At that point, Officer Cantrell considered the encounter with L.W. a *Terry*

stop, and he patted L.W. down "for weapons only." *Id.* During the pat down, Officer Cantrell did not feel anything like a weapon, but he did feel what seemed like a large number of coins in L.W.'s front pockets, and he could hear what sounded like coins "moving around." *Id.* After Officer Cantrell learned that the burglary suspect had stolen a large quantity of change, he arrested L.W. Thereafter, Officer Cantrell found some of Chisolm's jewelry and coins in L.W.'s pockets.

The State filed a petition against L.W. alleging his delinquency for burglary and theft. During the hearing on the petition, L.W. objected to the admissibility of the evidence obtained by police, arguing that Officer Cantrell's investigatory stop and ensuing search were illegal. The juvenile court admitted the evidence and ultimately adjudicated L.W. a delinquent child on both counts. This appeal ensued.

### DISCUSSION AND DECISION

■ L.W. contends that Officer Cantrell did not have reasonable suspicion to support an investigatory stop and that his seizure of him violated the Fourth Amendment.[1] The Fourth Amendment prohibits unreasonable searches and seizures by the government, and its safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Moultry v. State,* 808 N.E.2d 168, 170 (Ind.Ct.App.2004). However, a police officer may briefly detain a person for investigatory purposes without a warrant or probable cause if, based upon specific and articulable facts together with rational inferences from those facts, the official intrusion is reasonably warranted and the officer has a reasonable suspicion that criminal activity "may be afoot." *Id.* at 170–71 (quoting *Terry v. Ohio,* 392 U.S. 1,

21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ Reasonable suspicion is a " 'somewhat abstract' " concept, not readily reduced to " 'a neat set of legal rules.' " *Id.* at 171 (quoting *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). "When making a reasonable suspicion determination, reviewing courts examine the 'totality of the circumstances' of the case to see whether the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (quoting *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744). The reasonable suspicion requirement is met where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur. *Id.* It is well settled that reasonable suspicion must be comprised of more than an officer's general " 'hunches' " or unparticularized suspicions. *Webb v. State,* 714 N.E.2d 787, 788 (Ind.Ct.App.1999) (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

■ Here, the dispositive question is whether the tip Shockley provided to police was sufficient to support a determination of reasonable suspicion to perform an investigatory stop of L.W. The dissent maintains that "the fact that the tipster's identity was known to police was sufficient, by itself, to justify Officer Cantrell's stop." But this contention is contrary to our opinion in *State v. Glass,* 769 N.E.2d 639, 643 (Ind.Ct.App.2002), *trans. denied,* where we recognized that, "The fact that a named caller with an untested reputation called the police does not in itself establish reasonable suspicion." Indeed, both the United States Supreme Court and the Indiana

---

1. Because we reverse on Fourth Amendment grounds, we need not address L.W.'s separate argument under Article I, Section 11 of the Indiana Constitution.

Supreme Court have consistently held that the totality of the circumstances test applies to a determination of reasonable suspicion, even where a tipster identifies himself.

The dissent's reliance on *Kellems v. State,* 842 N.E.2d 352, 355 (Ind.2006), *rev'd on reh'g on other grounds,* 849 N.E.2d 1110 (Ind.2006), also goes too far. In *Kellems* our Supreme Court stated that the United States Supreme Court "has indicated that while a tip from an identified or known informant may not be sufficient to support a probable cause finding, such tips are sufficiently reliable to justify an investigatory *Terry* stop." 842 N.E.2d at 355 (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). But this language from *Kellems* is misleading when taken out of context.

What the Supreme Court actually meant in *Alabama* was not that such tips necessarily are—but that such tips may be— sufficiently reliable to justify a *Terry* stop. The Court observed that in *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court had found a tip made by an identified tipster sufficient to support reasonable suspicion, but not probable cause. 496 U.S. at 330, 110 S.Ct. 2412. In *Adams,* the Court noted that the informant was personally known to the police officer and had previously provided the officer with information. 407 U.S. at 146, 92 S.Ct. 1921. And the Court also noted that the informant "came forward personally to give information that was immediately verifiable at the scene" and that the informant subjected himself to arrest for false complaint. Thus, the *Adams* Court held that the tip "carried enough indicia of reliability" to justify the stop. *Id.* In *Alabama,* the Supreme Court summarized the formula for reasonable suspicion as follows:

Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez,* 449 U.S. 411, 417 [101 S.Ct. 690, 66 L.Ed.2d 621] (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*Alabama,* 496 U.S. at 330, 110 S.Ct. 2412; *see also, Adams,* 407 U.S. at 146–47, 92 S.Ct. 1921.

Likewise, in *Kellems,* our Supreme Court held that while a tip made by a so-called "concerned citizen" has greater indicia of reliability than that made by a professional informant, the ultimate test is "one of the totality of the circumstances." *See* 842 N.E.2d at 356. And while a concerned citizen who has identified himself makes himself susceptible to prosecution for false reporting, which "heightens the likelihood of the report's reliability," that is only one factor "bearing on the reasonableness of suspicion." *See id.* at 355–56. The Court concluded that:

[w]hile we agree with the logic that the prospect of prosecution for making a false report heightens the likelihood of the report's reliability, we think the State pushes the envelope too far to say that the prospect of prosecution for making a false report, standing alone, will in all cases constitute reasonable suspicion.

*Id.* at 355. In sum, neither the United States Supreme Court nor the Indiana Supreme Court has held that a tip from a tipster whose identity is known to the po-

lice is sufficient per se to establish reasonable suspicion. Thus, our analysis does not end with the fact that Shockley identified himself to dispatch.

Here, there is no evidence in the record that law enforcement had verified Shockley's identity or that his reliability was known prior to the investigatory stop of L.W. On this record, while Shockley identified himself, he was nonetheless a virtual stranger. Neither Officer Cantrell nor the police department knew whether he was "a concerned citizen, a prankster, or an imposter." *See Glass*, 769 N.E.2d at 643. And there is no evidence that Shockley identified himself in such a way that would place his credibility at risk or subject himself to criminal penalties. *See id.* Nor is there any indication that the tipster indicated that he had inside knowledge about the burglary or the suspect.[2] Shockley merely described the suspect's general build, shirt, and shoes. That same information was available to the general public and did not provide the police with sufficient information to corroborate Shockley's assertions. *See Kellems*, 842 N.E.2d at 356. This case is easily distinguishable on its facts from *Kellems*, where the tipster not only identified herself but was a person known to the police and accurately predicted future behavior.

This court's opinion in *State v. Glass*, 769 N.E.2d at 639, is dispositive here. In *Glass*, a self-identified caller offered limited information to police regarding possible criminal activity. Specifically, the caller identified himself to dispatch, reported a reckless driver, and gave a description of the offending vehicle. Officer Dana Fluery saw a vehicle matching the tipster's

description, but did not personally observe any traffic violations before initiating a traffic stop. In the course of the traffic stop, Officer Fluery suspected criminal activity and ultimately performed a pat down search of the driver, and Officer Fluery found marijuana in the driver's front pants pocket.

The State charged the driver with three misdemeanors, and the defendant moved to suppress the evidence, arguing that the officer lacked reasonable suspicion to detain and search him. The trial court granted the motion to suppress, and we affirmed. Our analysis on appeal was as follows:

> Here, the trial court granted the motion to suppress based upon our decision in *Washington v. State*, 740 N.E.2d 1241 (Ind.Ct.App.2000), *trans. denied* [, which addressed whether an uncorroborated anonymous tip could establish reasonable suspicion]. . . .
>
> The State disputes the relevance of *Washington*, and argues instead that *State v. Eichholtz* governs this case. 752 N.E.2d 163 (Ind.Ct.App.2001). There, Lenny Thatch was driving southbound on Meridian Street in Indianapolis when he observed a driver of a white Le Baron pull onto the street. The second driver repeatedly crossed the centerline into the northbound lanes and repeatedly drove onto the curb on the right side of the road. While following the car, Thatch called 911 and reported the erratic driving. In addition to the car's description, Thatch gave the dispatcher the car's license plate number and its location. Thatch also provided

---

**2.** The dissent maintains that the tipster's knowledge that the burglary had occurred at Chisolm's house indicates inside knowledge, but that is speculation. It is just as likely that anyone living in the neighborhood, including Shockley, knew about the burglary because the police had been called to the scene. Our review is limited to the record. *See Glass*, 769 N.E.2d at 644. There is no evidence that Shockley had inside knowledge of the burglary. The only evidence is that Shockley gave dispatch a description of a burglary suspect.

his name and described his own vehicle. Thatch remained on the line until a police officer arrived. The officer observed Thatch's car following a Le Baron bearing the reported license plate number. Without having witnessed any erratic driving or traffic violations, the officer stopped the Le Baron.

Our court recognized that, unlike the anonymous informant in *Washington*, Thatch identified himself to the 911 operator in such a manner that he could have been held legally responsible if he had filed a false police report. *Id.* at 167. We also pointed out that the police officer was able to confirm specific information about both cars and their location. *Id.* Thus, we held that the officer had reasonable suspicion to conduct the stop without having personally confirmed the erratic driving. *Id.* at 168.

The reasonable suspicion inquiry is determined on a case-by-case basis. *Francis* [*v. State*, 764 N.E.2d [641,] 644 [Ind.Ct.App.2002]. Thus, neither *Washington* nor *Eichholtz* directly controls the case before us. Nevertheless, we examine the facts presented in light of those cases.

In contrast to *Washington*, the dispatcher here knew the identity of the caller. Although we cannot discern if Officer Fluery also knew the caller's identity, an investigative stop may be based upon the collective information known to the law enforcement organization as a whole. *See Kindred v. State*, 524 N.E.2d 279, 292 (Ind.1988) (discussing probable cause, but citing *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) for application of rule in the context of reasonable suspicion). Even if we impute such knowledge to Officer Fluery, however, the trial court merely found that "the police knew the name." Appellant's App. p. 64. Unlike in *Eichholtz*,

the identity of the caller was never verified. Further, the caller's reliability was unknown.

Generally, information gleaned from a telephone caller differs from that obtained in a face-to-face encounter. In the latter situation, a trained officer has the opportunity to assess credibility and motive by observing facial expressions and subtle body language. *See, e.g., Bogetti v. State*, 723 N.E.2d 876 (Ind.Ct. App.2000) (holding that a *Terry* stop was warranted where a person reported directly to a police officer at a restaurant that a driver who had just left in a white semi-truck "may be intoxicated"). *Here, at the time of the stop, Fluery did not know whether the caller was a concerned citizen, a prankster, or an imposter. Further we cannot discern whether the caller identified himself in such a way as to place his credibility at risk or as to subject himself to criminal penalties.*

In *Eichholtz*, the police officer visually confirmed that the caller was following the alleged offender and, thus, could reasonably have observed errant driving patterns. No such confirmation occurred in this case. *The fact that a named caller with an untested reputation called the police does not in itself establish reasonable suspicion.*[6]

[Internal footnote 6] In drawing this conclusion we are cognizant of our supreme court's statement: "Where police officers in the street act in good faith reliance on a dispatch from their own or another police agency that a crime has been committed, there is no need to show the source of the dispatcher's information or the reliability of the dispatcher's informant." *Moody v. State*, 448 N.E.2d 660, 663 (Ind.1983). To the extent the quoted language suggests that every call to a dispatcher is sufficient in itself to satisfy the Fourth Amendment, it paints Fourth Amendment jurisprudence with too broad a brush. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (holding that police officer

did not have probable cause for a warrantless arrest based upon a state police bulletin originating from an informant's tip).

We next review the content and reliability of the information offered by the caller. The transcript shows that Officer Fluery was not permitted to recount the dispatcher's exact words. He merely testified that the dispatcher "gave a description of the vehicle" allegedly driving recklessly, which at some point he "found." Tr. p. 13. Without more, we cannot determine whether Fluery identified Glass's vehicle based upon the color and make of the car, its age, its license plate, its location or direction of travel, a description of the occupant, or a combination of those factors. Nor can we determine the elapse of time between the dispatch and Fluery's identification of the vehicle.

*Although the police may have possessed more information, we must base our decision on the record before us. The State merely showed that the caller described a car sufficiently to permit Officer Fluery to identify a similar vehicle.* The officer followed the vehicle for about one block without observing any driving irregularities. *Officer Fluery did not personally observe facts to verify the reliability of the caller or the reliability of any significant information provided by the caller.*[7] To the extent that the caller predicted future conduct, it did not occur.

[Internal footnote 7] The State directs us to Glass's statement that he had passed a car that then followed him into Connersville. According to the State, Glass's testimony shows the information provided by the caller was based upon personal observation. Our concern today, however, is not with Glass's knowledge at the time of the stop but, rather, with Officer Fluery's

knowledge. *Francis,* 764 N.E.2d at 644. Fluery did not mention having seen the caller's vehicle.

Reasonable suspicion requires more than conjecture. On the record created, the State has not demonstrated that Officer Fluery had an objective and articulable suspicion that Glass had committed, was committing, or was about to commit legal wrongdoing. The investigative stop violated Glass's Fourth Amendment rights. The trial court's decision to suppress evidence seized was not contrary to law.

*Id.* at 642–44 (emphases added).

Here, again, there is no evidence that Shockley identified himself in a way that would place his credibility at risk or subject himself to criminal penalties. *See id.* Nor did Shockley demonstrate any inside knowledge or provide significant information that Officer Cantrell could corroborate. *See id.* And, as in *Glass,* the police merely knew Shockley's name, but his reputation was untested.

 We must consider both the content and reliability of the information provided by Shockley. At trial, Officer Cantrell testified that at the time that he stopped L.W., the *only* information that he had about the burglary suspect was that he was a "tall black male wearing [a] black shirt and black shoes." Transcript at 19. As the dissent observes, and as we stated in *Glass,* "an investigative stop may be based upon the collective information known to the law enforcement organization as a whole." 769 N.E.2d at 643. Such information may be imputed to the officer in the field. But, while the police may have possessed more information about the suspect,[3] "we must base our decision on

**3.** The case incident report states that dispatch described the suspect as a tall black male with a black shirt "with a white shirt under the black shirt" and wearing black shoes "head-

ing south on Kitley Avenue." Appellant's App. at 49. But that report was not admitted into evidence.

the record before us." *See id.* at 644. Here, just as in *Glass,* the State merely showed that the caller described an individual sufficiently to permit Officer Cantrell to identify a similar individual.

■ The State contends that there was reasonable suspicion for the *Terry* stop "[g]iven [L.W.'s] location near the site of the burglary, his apparent unease with the presence of a police officer, and his similarity to the description of the suspect[.]" First, the evidence shows only that the burglary occurred sometime between approximately 8:30 p.m. and 10:00 p.m. that night. Officer Cantrell testified that he heard about the burglary and description of the suspect "after 10:00." Transcript at 16. Given the hour and a half window of time during which the crime occurred, and the lack of evidence regarding the lapse of time between the dispatch and Officer Cantrell's encounter with L.W., the significance of L.W.'s location in the neighborhood is marginal. Indeed, while L.W. was two blocks away from Chisolm's house at the time of the stop, he was also two blocks away from his cousin's house, where he told Officer Cantrell he had just been playing basketball.

Second, Officer Cantrell testified only that L.W. "looked like he wanted to run but he didn't." Transcript at 20. While a suspect's actual flight from law enforcement may support a determination of reasonable suspicion, *see Platt v. State,* 589 N.E.2d 222, 226 (Ind.1992), Officer Cantrell's speculation about L.W.'s intention was nothing more than a hunch, which is not enough. There must be an objective basis for any such suspicion. *See Moultry,* 808 N.E.2d at 171 There is no evidence that L.W. made any furtive gestures or movements. L.W. did not flee, but stopped, followed Officer Cantrell's commands, and answered his questions. And, third, Shockley's description of the suspect

lacked sufficiently distinguishing characteristics to provide a basis for meaningful corroboration. Finally, the dissent points out that L.W. "had bulging pockets," but our review of the transcript indicates that Officer Cantrell did not notice the bulging pockets until after he had initiated the pat down search.

■ Reasonable suspicion requires more than mere conjecture. *See Glass,* 769 N.E.2d at 644. The fact that a named caller with an untested reputation called the police does not in itself establish reasonable suspicion. *Id.* at 643. Considering the totality of the circumstances, the whole picture, including both the quantity and quality of information, *see Alabama,* 496 U.S. at 330, 110 S.Ct. 2412, we conclude that the information the police possessed was insufficient to support an investigatory stop of L.W. Stated another way, on the record before us, the State has not demonstrated that based on specific and articulable facts Officer Cantrell had a particularized and objective basis to suspect that L.W. had committed, was committing, or was about to commit legal wrongdoing. *See Glass* at 644. Accordingly, we must reverse L.W.'s adjudications as a delinquent child.

Reversed.

FRIEDLANDER, J., concurs.

BRADFORD, J., dissents with separate opinion.

BRADFORD, Judge, dissenting.

Believing, as I do, that ample reasonable suspicion existed to stop and frisk L.W., I would not reverse L.W.'s delinquency adjudications on the basis that reasonable suspicion did not exist. I would first like to take this opportunity to include a few words on the general nature of reasonable suspicion.

The officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means a fair probability that contraband or evidence of a crime will be found, and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause.

*Alabama v. White,* 496 U.S. 325, 329–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (citations and quotation marks omitted). Along the same lines, the Indiana Supreme Court has recently noted that "[r]easonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, but it still requires at least a minimal level of objective justification and more than an inchoate and unparticularized suspicion or "hunch" of criminal activity. *State v. Schlechty,* 926 N.E.2d 1, 7–8 (Ind.2010) (citing *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). It is clear from the above that a police officer does not need to have anything close to proof that a certain person committed a crime in order to justify a *Terry* stop, a threshold easily met in this case, in my view.

As an initial matter, as the majority acknowledges, the record indicates that the tip received by police was not, in fact, anonymous, but provided by one Brandon Shockley. (Tr. 18). Although the record is not explicit as to when Shockley's identity was discovered, the most reasonable inference is that he identified himself to police when providing his tip. Moreover, it is of no moment that Officer Cantrell was not aware of Shockley's identity before the stop of L.W., so long as *somebody* in the Lawrence Police Department was. "In Indiana, the knowledge of the entire police force may be imputed to an arresting or searching officer." *Mayfield v. State,* 402 N.E.2d 1301, 1306 n. 4 (Ind.Ct. App.1980) (*citing State v. Mooney,* 398 N.E.2d 698, 700 (Ind.Ct.App.1979)). Unlike the majority, I am not inclined to disregard evidence that the tipster's identity was known, regardless of the State's lack of reliance on it. I believe this approach to be consistent with the standard of review we employ when reviewing the validity of a search and seizure, which requires us to "consider the evidence most favorable to the ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling." *Callahan v. State,* 719 N.E.2d 430, 434 (Ind.Ct.App.1999) (citing *Melton v. State,* 705 N.E.2d 564, 566 (Ind.Ct.App.1999)). Moreover, it is well-settled that "[w]e are bound to affirm the action of the [juvenile] court if any valid basis exists to support it." *State v. Keith,* 482 N.E.2d 751, 754 (Ind.Ct.App.1985). So, at the outset, I would consider the evidence that the tipster was known and not, in fact, anonymous.

With this in mind, I believe that the fact that the tipster's identity was known to police was sufficient, by itself, to justify Officer Cantrell's stop. "The United States Supreme Court . . . has indicated that while a tip from an identified or known informant may not be sufficient to support a probable cause finding, such tips are sufficiently reliable to justify an investigatory *Terry* stop." *Kellems v. State,* 842 N.E.2d 352, 355 (Ind.2006) (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). This is not,

however, the only indication of the tip's reliability, in my view.

I also believe that the fact that Shockley was apparently a concerned citizen (as opposed to a professional police informant) further indicates the tip's reliability. The Indiana Supreme Court has observed that information received from concerned citizens is generally more reliable than that received from professional informants and that concerned citizens

> generally come forward with information out of the spirit of good citizenship and the desire to assist law enforcement officials in solving crime. They are usually one-time informants and no basis exists from prior dealings to determine their reliability. Further, information of this type usually goes to past completed crimes rather than future or continuing crimes. Some jurisdictions have therefore held that informants of this type are to be considered reliable ... unless incriminating circumstances exist which cast suspicion upon the informant's reliability.

*Pawloski v. State*, 269 Ind. 350, 354, 380 N.E.2d 1230, 1232–33 (Ind.1978). Given that there are no circumstances casting suspicion on Shockley's honesty, his status as a concerned citizen further increases the reliability of his information.

Finally, I believe that the tip indicates Shockley's inside knowledge, bolstering its reliability even more. *See, e.g., Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" (citation omitted)). Even though the record does not disclose the precise information conveyed,

Shockley's tip obviously contained at least one piece of information not yet available to the general public, *i.e.*, that a burglary had recently occurred in the area.[4] The tip was therefore corroborated by what the police already knew. When Officer Cantrell encountered L.W. two blocks from Chisolm's home, he fit Shockley's description "to a T" and had bulging pockets, which might have contained a weapon.

In summary, I believe that Officer Cantrell's stop of L.W. was justified by reasonable suspicion that he was involved in the burglary of Chisolm's residence. Moreover, Officer Cantrell was justified in patting L.W. down solely on the basis that he was suspected of committing the inherently dangerous crime of burglary. *See N.W. v. State*, 834 N.E.2d 159, 165 (Ind.Ct.App. 2005), *trans. denied.* I would not reverse L.W.'s adjudications on the basis that police lacked reasonable suspicion to stop him under the Fourth Amendment.

As for L.W.'s claim on appeal that the pat-down ran afoul of Article 1, Section 11, of the Indiana Constitution, L.W. did not make that argument below and I would conclude that he has waived it for appellate consideration. *See, e.g., N.W. v. State*, 834 N.E.2d 159, 162 n. 2 (Ind.Ct.App.2005), *trans. denied.* Moreover, after evaluating L.W.'s remaining claims on appeal, I find them to be without merit and so would affirm the juvenile court's judgment in all respects. As such, I must respectfully dissent.

---

**4.** We know this because the police dispatcher broadcast the description Shockley gave them as being that of the suspect in the burglary at Chisolm's residence.