

FILED

Mar 12 2020, 10:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Shay J. Hughes
Tippecanoe Public Defender's Office
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Courtney Staton
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Justin Danh,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | March 12, 2020<br><br>Court of Appeals Case No.<br>19A-CR-1148<br><br>Appeal from the Tippecanoe<br>Superior Court<br><br>The Honorable Steven Meyer,<br>Judge<br><br>Trial Court Cause No.<br>79D02-1809-F3-26 |

**May, Judge.**

[1] Justin Danh appeals the denial of his motion to suppress. He argues the trial court abused its discretion when it denied his motion to suppress the evidence found during the search of his vehicle because the search of his vehicle violated

his Fourth Amendment right against unreasonable search and seizure. Specifically, Danh argues (1) the officer did not have reasonable suspicion to perform a patdown search of him or a canine sniff of his vehicle and (2) the dog sniff search of Danh's car unreasonably prolonged the duration of the traffic stop. We affirm.

# Facts and Procedural History[1]

On December 12, 2017, Officer Keifer Mikels, a Purdue University Police Officer, was dispatched to McCutcheon Hall, located on Purdue University's campus, when an anonymous caller reported a resident of the dormitory was using drugs. Upon his arrival at the room where the activity was reported, Officer Mikels deployed his K9, who alerted to the presence of narcotics in the room. Officer Mikels was unable to make contact with the residents of the room at that time and went to the front desk to inquire as to the names of the room's residents. The front desk indicated Justin Danh and his roommate, Calvin, lived there.

Officer Mikels returned on January 14, 2018, to continue the investigation and spoke with Calvin, who expressed concern over Danh's alleged narcotics activity but would not allow Officer Mikels to search the room. Officer Mikels

---

[1] We held oral argument in this appeal on February 11, 2020, at Indiana State University. We thank counsel for their able presentations, and we thank the staff and students of Indiana State University for their attention and hospitality.

did not submit a report on this investigation, and there is nothing in the record indicating he spoke with Danh during this time.

[4] At some point between August 21, 2018, and September 11, 2018, Officer Mikels read a report drafted by West Lafayette Police Department ("WLPD") Officer Michael Max that indicated Officer Max spoke with Danh's new roommate, Tristin Moreno, on August 21, 2018. Moreno reported to Officer Max that Danh had been using drugs and had shown Moreno a handgun that Moreno described as a Chippewa Model 1911, .22 caliber handgun that was either blue or black with a wooden grip and a missing rear sight. Moreno stated Danh's girlfriend, Alexis, also saw the gun and Danh stored the gun behind the headboard of his bed. Moreno told the officer that Danh told Moreno that the gun was stolen. Moreno had touched the gun and was concerned he would get in trouble with the police.

[5] The report also indicated Moreno called shortly after his interview with Officer Max to report that, when he returned home, Danh's bedroom door was open and the bed had been moved, indicating the handgun stored there might not be at the apartment. Approximately five hours later, Moreno's father called the police to report that Moreno had entered Danh's room but had not located the gun; instead, Moreno found .22 caliber ammunition and a bag of pills. According to the report, Moreno was to call Officer Max when Danh returned home so Officer Max could speak to Danh. The report did not indicate if Officer Max ever spoke to Danh. Officer Max indicated in the report that a

handgun matching the description Moreno gave had been stolen from a nearby pawn shop.

[6] On September 11, 2018, Officer Mikels initiated a traffic stop of Danh's vehicle based on the vehicle's alleged failure to signal a turn. Officer Mikels collected identification from Danh and his passenger, Alexis Pantig. Officer Mikels radioed for back-up based on his belief Danh possessed the handgun from the earlier WLPD report. Officer Mikels searched the relevant databases for information regarding Danh and Pantig, such as the existence of a suspended license or outstanding warrant, but Officer Mikels did not find anything. Shortly thereafter, back-up officers arrived on scene. Officer Mikels later testified he "suspend[ed] the original traffic infraction investigation" when the back-up officers arrived. (Tr. Vol. II at 52.)[2]

[7] Officer Mikels told a back-up officer, Sergeant Balzer, that he believed, based on Moreno's earlier statement, that Danh possessed an allegedly stolen firearm. He told Sergeant Balzer that he did not smell anything when he approached the vehicle and did not know if Danh had the firearm in his possession, but that he also knew Danh was "dealing pills out of McCutcheon." (State's Ex. 2 at 06:37 – 06:38.)

[8] Officer Mikels asked Danh to exit the vehicle. After Danh exited the vehicle, Officer Mikels performed a pat-down search. Officer Mikels asked Danh if he

---

[2] Officer Mikels did not issue a traffic ticket or warning for Danh's traffic infraction.

possessed the firearm in question, and Danh denied having the firearm. Officer Mikels asked Danh if he could search Danh's vehicle, and Danh did not consent to a search.

[9] Officer Mikels continued his conversation with Danh, discussing Danh's recent arrest for operating a vehicle while intoxicated. Sergeant Balzer removed Pantig from the vehicle and conducted a canine search of Danh's vehicle. The canine alerted to the presence of drugs. The officers searched Danh's vehicle and found Xanax and marijuana. Danh admitted that he had prescription drugs in the car for which he did not have a valid prescription. Police then placed Danh under arrest and administered his *Miranda*[3] warnings. Danh admitted possessing the handgun in question, but he indicated the handgun was located at his apartment. Danh gave police permission to search his apartment. Officers then searched Danh's apartment where they found a handgun and additional Xanax and marijuana.

[10] On September 11, 2018, the State charged Danh with Level 3 felony dealing a schedule IV controlled substance,[4] Level 6 felony possession of a controlled substance,[5] Level 6 felony maintaining a common nuisance,[6] Class A

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] Ind. Code § 35-48-4-3(a)(1).

[5] Ind. Code § 35-48-4-7(a).

[6] Ind. Code § 35-45-1-5(c).

misdemeanor possession of a controlled substance,[7] and Class B misdemeanor possession of marijuana.[8]  On December 18, 2018, Danh filed a motion to suppress the evidence found as part of the vehicle and apartment searches.  On March 1, 2019, the trial court held a hearing on the matter and denied Danh's motion on April 17, 2019.  On April 24, 2019, Danh filed a motion for certification of interlocutory appeal, which the trial court granted.  On May 22, 2019, Danh filed a motion for this court to accept the interlocutory appeal, which we granted.

# Discussion and Decision

[11]     Our standard of review for the denial of a motion to suppress evidence is similar to that of other sufficiency issues.  *Jackson v. State*, 785 N.E.2d 615, 618 (Ind. Ct. App. 2003), *reh'g denied*, *trans. denied*.  We determine whether there is substantial evidence of probative value to support denial of the motion.  *Id*.  We do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling.  *Id*.  However, the review of a denial of a motion to suppress is different from other sufficiency matters in that we must also consider uncontested evidence that is favorable to the defendant.  *Id*.  We

---

[7] Ind. Code § 35-48-4-7(a).

[8] Ind. Code § 35-48-4-11(a)(1).

review *de novo* a ruling on the constitutionality of a search or seizure. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008).

[12] The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. To deter State actors from violating that prohibition, evidence obtained in violation of the Fourth Amendment generally is not admissible in a prosecution of the citizen whose right was violated. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). The State has the burden of demonstrating the admissibility of evidence collected during a seizure or search. *Id*.

[13] A traffic stop is a seizure that must comply with the Fourth Amendment. *McLain v. State*, 963 N.E.2d 662, 666 (Ind. Ct. App. 2012), *trans. denied*. It is well-settled that a traffic stop "must be supported by, at least, reasonable suspicion that a traffic law has been violated or other criminal activity is afoot." *Bush v. State*, 925 N.E.2d 787, 790 (Ind. Ct. App. 2010), *clarified on reh'g* 929 N.E.2d 897 (Ind. Ct. App. 2010). An officer may stop and briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion of criminal activity, even if the officer lacks probable cause to make an arrest. *Armfield v. State*, 918 N.E.2d 316, 319 (Ind. 2009).

# 1. Reasonable Suspicion

[14] An officer may perform a brief investigatory stop when, based on the totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

> Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990). Even though different, reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. *Id*. "Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.'" *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

*Washburn v. State*, 868 N.E.2d 594, 601 (Ind. Ct. App. 2007), *trans. denied*.

## *A. Nature of Tip*

[15] In examining the totality of the circumstances herein, we first consider whether Moreno's tip regarding Danh's possession of a firearm and pills was anonymous or that of a concerned citizen. Reasonable suspicion can be based on "an anonymous informant's tip if other facts establish reliability or the basis of the informant's knowledge." *Hardister v. State*, 849 N.E.2d 563, 570 (Ind.

2006). "Corroboration is ordinarily necessary where nothing the tipster said shows either reliability or the informant's basis of knowledge." *Id.*

[16] However, when a "concerned citizen" offers a tip of criminal activity, the reviewing court is to determine whether there existed reasonable suspicion based on a totality of the circumstances. *Russell v. State*, 993 N.E.2d 1176, 1180 (Ind. Ct. App. 2013). In doing so, the court considers:

> 1) whether the citizen has personally witnessed the reported crime, 2) whether the police subsequently corroborate details of the citizen's report, 3) whether the citizen has identified herself and thereby subjected herself to civil liability or prosecution for false reporting, and 4) the absence of circumstances casting the citizen's reliability into question.

*Trimble v. State*, 842 N.E.2d 798, 803-4 (Ind. 2006), *adhered to on reh'g at* 848 N.E.2d 278 (Ind. 2006). "[W]hen a citizen volunteers information to the police, there may be more reason to believe that the information is reliable because informants who come forward voluntarily are ordinarily motivated by good citizenship or a genuine effort to aid law enforcement officers in solving a crime." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010).

[17] Danh argues Moreno's tip was anonymous, such that Officer Mikels was required to corroborate the tip. Danh likens the facts of his case to those in *State v. Glass*, 769 N.E.2d 639, 644 (Ind. Ct. App. 2002), *trans. denied*, where we held that an anonymous tip without separate corroboration by the officer was not sufficient to establish reasonable suspicion for an investigatory stop. In *Glass*, the officer received a report of a suspicious vehicle driving recklessly. *Id.*

at 640. The officer did not know the caller's identity, but dispatch indicated it knew the caller and the caller had provided a description of the vehicle.

[18] The officer observed Glass driving the vehicle described and followed the vehicle for one block. *Id*. The officer did not observe any traffic violations, but based on the tip, he initiated a stop of the vehicle. When the officer stopped Glass, he noticed Glass was shaking and his driver's license was expired. As part of a patdown search, the officer discovered a "hard rectangular-shaped object in the front groin area of Glass's trousers." *Id*. That item was later identified as a box containing a green leafy substance and a smoking device. *Id*. at 641. Based thereon, the officer arrested Glass and the State charged Glass with several offenses related to marijuana possession and driving under the influence.

[19] Glass filed a motion to suppress, arguing "the detention and search occurred without reasonable suspicion." *Id*. The trial court granted his motion to suppress because the caller was anonymous and the officer had not observed anything to corroborate the tip that Glass was driving recklessly. The State appealed, arguing the officer had reasonable suspicion because dispatch knew the name of the caller, and thus the call was not anonymous. We disagreed and held the officer did not have reasonable suspicion because while the State provided evidence that "the caller described a car sufficiently to permit [the officer] to identify a similar vehicle[,]" the officer did not "personally observe facts to verify the reliability of the caller or the reliability of the significant

information provided by the caller. To the extent that the caller predicted future conduct, it did not occur." *Id*. at 644.

[20] The State argues Officer Mikels had significantly more information than the officer in *Glass*, and we agree. The tip from Moreno was not anonymous. Moreno "made an in-person police report" and identified himself to police when providing the information about the gun he saw in Danh's possession. (App. Vol. II at 51.) Officer Michael Max of the WLPD recorded Moreno's address,[9] as well as Danh's date of birth. Moreno told Officer Max that he had known Danh "for several years as they went to high school together." (State's Ex. 1.) In addition, Moreno stated, "after he had moved in with Danh he found out he drinks a lot and is using drugs." (*Id*.)

[21] Moreno told Officer Max that the day before at approximately 6:00 p.m., Danh had asked Moreno to come to Danh's room where Danh retrieved a handgun from behind his bed and showed it to Moreno. Moreno provided the type and color of the handgun and reported "Danh told him the gun was clean and no bodies were attached to it but the gun was stolen." (*Id*.) Moreno was concerned that his fingerprints would be on the gun because Danh had handed it to him during their conversation.

---

[9] There is a portion of the report that is redacted; based on the location of the information and a similar formatting with regards to Danh, the redacted portion of the report is Moreno's birthdate.

After his initial report at the police station, Moreno called Officer Max and told him that when Moreno arrived home, he noticed Danh's bedroom door open and Danh's bed moved and, therefore, Moreno "had no idea where the gun could be now." (Id.) Moreno told Officer Max he would call when Danh returned home and he also provided Officer Max with Danh's schedule. Later that day, Moreno's father called Officer Max and reported that Moreno had entered Danh's room and found ammunition and a bag of pills in Danh's closet. Based on the specificity of the tip provided by Moreno, and the personal information provided to police for follow up, we conclude Moreno's tip was that of a concerned citizen. *See Kellems v. State*, 842 N.E.2d 352, 355-6 (Ind. 2006) (citizen's 911 call including name, date of birth, and address was sufficient to consider her tip as one from a concerned citizen as the information provided opened the citizen to criminal prosecution should her report have been false), *rev'd on reh'g on other grounds* 849 N.E.2d 1110, 1114 (Ind. 2006).

## B. Staleness of Information

[23] When assessing whether Officer Mikels had reasonable suspicion to initiate an investigatory stop of Danh based on his alleged possession of a firearm or drugs, we also consider whether the information Officer Mikels used to formulate that reasonable suspicion was stale. *See Washburn*, 868 N.E.2d at 601 (staleness of information included in totality of the circumstances analysis when determining the existence of reasonable suspicion). Here, the information obtained from Moreno was approximately three weeks old, and some of that information, specifically regarding Danh's drug use and possession,

corroborated an investigation Officer Mikels personally conducted nine months prior in a Purdue University residence hall where Danh lived.

[24] Even though Moreno's tip was approximately three weeks old, it was specific and Moreno provided multiple personal details as to avail himself to criminal prosecution should his report be found false. Some of the details given by Moreno, specifically regarding Danh's drug use and the type of gun Danh showed Moreno, were corroborated by other investigations. Based on the totality of the circumstances, we conclude Officer Mikels had reasonable suspicion that Danh possessed a firearm and illegal substances, which justifies the patdown search of Danh and the dog sniff of Danh's vehicle. *See Teague v. State*, 891 NE.2d 1121, 1130 (Ind. Ct. App. 2008) (totality of circumstances, including reliability of tip and staleness of information, sufficient to provide reasonable suspicion).

## 2. Dog Sniff

[25] A "dog sniff" sweep of a vehicle is not a search protected by the Fourth Amendment. *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013). When a dog sniff occurs incident to a legitimate traffic stop and does not prolong the stop beyond what is necessary to complete the purpose of the traffic stop, no reasonable suspicion of drug-related activity is required. *Bush*, 925 N.E.2d at 790. If a dog sniff occurs after the completion of a traffic stop, an officer must have reasonable suspicion of criminal activity in order to proceed thereafter with an investigatory detention. *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind.

Ct. App. 2001). The critical facts in determining whether a vehicle was legally detained at the time of the canine sweep are whether the traffic stop was concluded and, if so, whether there was reasonable suspicion at that point to continue to detain the vehicle for investigatory purposes. *Id*. at 273-4. The burden is on the State to show the time for the traffic stop was not increased due to the canine sweep. *Id*. In assessing whether a detention is too long in duration, we examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. *Id*.

[26] Here, Officer Mikels testified at the suppression hearing that he suspended the purpose of the traffic stop once back-up officers arrived on scene. Additionally, as discussed *supra*, Officer Mikels had reasonable suspicion that Danh possessed illegal substances based on his prior investigation at McCutcheon Hall and Moreno's tip, which indicated Danh was using drugs and had a bag of pills in Danh's closet. Therefore, we need only consider whether the dog sniff of Danh's vehicle unreasonably prolonged the traffic stop. We conclude it did not.

[27] Looking at the chronology of the traffic stop as portrayed in the dashcam video provided in State's Exhibit 1, approximately three minutes elapsed between the time Officer Mikels initiated the traffic stop and Officer Mikels returned to his car to run checks on Danh and Pantig's licenses. Two minutes later, back-up officers arrived on scene, at which time Officer Mikels testified he suspended the purpose of the traffic stop. One and one-half minutes later, Danh exited his vehicle for Officer Mikels to perform a patdown search; that search was

completed in thirty seconds. Officer Mikels then engaged in conversation with Danh regarding his alleged possession of a firearm and an earlier traffic violation. He informed Danh that he would be completing a canine sniff of his vehicle, and he asked Danh if Danh would give permission to search his vehicle. Danh declined, and two minutes after Officer Mikels completed the patdown search of Danh, a canine officer began a sniff search of Danh's vehicle. Ten seconds after the beginning of that search, the canine alerted to illegal substances in Danh's vehicle. These events lasted less than ten minutes total, and the dog sniff prolonged any investigation by slightly over two minutes. Based thereon, we cannot say the dog sniff search of Danh's car, which was supported by reasonable suspicion, unreasonably delayed the traffic stop and violated Danh's Fourth Amendment rights. *See Doctor v. State*, 57 N.E.3d 846, 855-6 (Ind. Ct. App. 2016) (concluding three to six-minute extension of traffic stop to obtain dog sniff search was not unreasonable).

# Conclusion

[28] Officer Mikels had reasonable suspicion to believe that Danh possessed a firearm and/or illegal substances when he stopped Danh for a traffic violation. Additionally, the canine search did not unreasonably prolong the traffic stop. Therefore, the patdown and canine searches did not violate his Fourth Amendment rights. Accordingly, we affirm the denial of Danh's motion to suppress.

[29] Affirmed.

Baker, J., and Robb, J., concur.