

FILED

Nov 18 2016, 10:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael G. Moore
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles Dunson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | November 18, 2016 <br><br> Court of Appeals Case No. 49A04-1603-CR-469 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Shatrese Flowers, Judge <br><br> The Honorable Peggy Hart, Magistrate <br><br> Trial Court Cause No. 49G20-1412-F5-53840 |

**Barnes, Judge.**

## Case Summary

[1] Charles Dunson challenges his conviction for Level 5 felony carrying a handgun without a license. We affirm.

## Issue

[2] Dunson raises one issue, which we restate as whether the trial court properly admitted into evidence a handgun seized during an investigatory stop.

## Facts

[3] On November 20, 2014, officers from the Indianapolis Metropolitan Police Department were dispatched to the 2400 block of Kenwood Avenue after a number of 911 calls reported men with guns in the area. There was angry shouting audible in some of the calls, and one of the dispatches to police noted those sounds. The dispatchers also relayed reports from callers that there were thirty people gathering and that one caller reported someone was attempting to kick in his door.

[4] Officer Matthew Addington and Deputy William Bennett responded to the dispatches and participated in a traffic stop involving someone thought to be involved in the incident. Meanwhile, Officers Tiffany Wren and Cathy Faulk also responded to the disturbance and spoke with Tamika Coleman, who was the victim of the altercation. Coleman was bleeding around her lips and nose, her nose appeared to be broken, and sections of her hair were torn out. Coleman's shirt was also torn, and there were footprints on her shirt. Coleman was "very upset, she was crying, she was agitated . . . ." Tr. p. 152. While

Officers Wren and Faulk talked to Coleman, a man drove past on a scooter or motorcycle, and Coleman indicated to the other nearby officers that he was "involved."[1] *Id.*

[5] Officer Faulk issued a police radio broadcast indicating she had a "conscious and alert" female who was "bleeding from the face" and then stated "there's a "black male on a silver scooter, he's coming toward you; he may be involved" and described it as a "big scooter, looks like a motorcycle." Ex. 3, track 14. Officer Addington responded, "I see it. It's coming down Kenwood towards Twenty-Second," and then stated, "I have him detained." *Id.*

[6] After Dunson stopped his motorcycle, Officer Addington approached him and "noticed a bulge[] in [Dunson's] groin area . . . there was a flat top to it with a shirt over top that. Ah, there's a larger bulge beneath that about the waist line a belt line of the pants of the driver." Tr. p. 67. Officer Addington believed the bulge was a weapon, and he patted Dunson down. Officer Addington discovered a 9mm Ruger in Dunson's waist band and seized it.

[7] The State charged Dunson with Class A misdemeanor carrying a handgun without a license and enhanced the charge to a Level 5 felony because Dunson had a prior conviction for the same offense. Dunson filed two motions to suppress, both of which the trial court denied following evidentiary hearings.

---

[1] Coleman testified during Dunson's trial that she did not state Dunson was involved in the incident.

Dunson was tried in a bifurcated bench trial. During the trial, Dunson challenged the admissibility of the handgun. The trial court overruled Dunson's objection, admitted the handgun into evidence, and found Dunson guilty of carrying a handgun without a license. Dunson stipulated to the Level 5 felony enhancement. The trial court sentenced Dunson to 2210 days in the Department of Correction. Dunson now appeals his conviction.

## Analysis

Because Dunson appeals following trial and did not seek interlocutory review of the denials of his motions to suppress, the issue in this matter is "appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial." *Rhodes v. State*, 50 N.E.3d 378, 381 (Ind. Ct. App. 2016) (citation omitted), *trans. denied*. "We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling." *Id*. We also consider the uncontested evidence favorable to the defendant. *Id.*

The Fourth Amendment to the United States Constitution generally prohibits a warrantless search or seizure absent a valid exception to the warrant requirement. *Peak v. State*, 26 N.E.3d 1010, 1014 (Ind. Ct. App. 2015). A traffic stop is a seizure. *Id*. However, an officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Robinson v. State*, 5 N.E.3d 362, 367 (Ind. 2014) (quotations omitted) (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (2014)). "The existence of

reasonable suspicion is determined by looking at the totality of the circumstances to see whether the detaining officer has a particularized and objective basis for suspecting wrongdoing." *Peak*, 26 N.E.3d at 1015. "The reasonable suspicion requirement is met where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur." *L.W. v. State*, 926 N.E.2d 52, 55 (Ind. Ct. App. 2010).

> [Stops initiated pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)] are limited in scope and purpose. Their purpose is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence . . . . Since reasonable suspicion is all that is necessary to support a *Terry* stop and it is a less demanding standard than probable cause . . . [t]he Fourth Amendment requires [only] some minimal level of objective justification for making the stop.

*Kellems v. State*, 842 N.E.2d 352, 355 (Ind. 2006) (second and third alterations in original) (citations omitted) (quotations omitted), *reh'g granted on other grounds*.

Dunson contends the *Terry* stop in this case violated his rights under the Fourth Amendment[2] because "[t]he stopping officers lacked reasonable suspicion to believe [he] was engaged in criminal activity prior to stopping him and any knowledge known to the investigating officer cannot be imputed on the stopping officer." Appellant's Br. p. 8. Dunson acknowledges that

---

[2] Dunson does not challenge the propriety of the stop pursuant to the Indiana Constitution.

"information obtained by one investigating officer may be relied upon by other law enforcement officials called upon to assist in the investigation of a suspect" under the theory of "collective knowledge." *Id.* However, he contends that Officer Faulk's radio broadcast that Dunson "'may be involved' is not specific and articulable enough to support the finding that the stopping offers had a reasonable suspicion that Dunson was involved in criminal activity." *Id.* at 10.

[13] Our supreme court has stated: "Information obtained by one officer may be relied upon by other law enforcement officials who are called upon to assist in the investigation and arrest of a suspect, as long as the officer who obtained the information possessed probable cause[3] to make the arrest." *Heffner v. State*, 530 N.E.2d 297, 300 (Ind. 1988) (citing *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675 (1985)).

> In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Hensley*, 469 U.S. at 230, 105 S. Ct. at 681.

---

[3] We note that several of the cases on which we rely discuss collective knowledge of law enforcement officials as it relates to possessing probable cause and making arrests as opposed to reasonable suspicion and investigatory stops. Because the former is a higher standard, we see no reason these cases should not apply equally to arrest scenarios and scenarios, like the one at issue here, involving investigatory stops. *See Clark v. State*, 994 N.E.2d 252, 261 (Ind. 2013) (noting reasonable suspicion is a lower standard than that required for an arrest).

[14]     More recently, our supreme court again stated:

> Probable cause can rest on collective information known to the law enforcement organization as a whole, and not solely on the personal knowledge of the arresting officer. The police force is considered a unit. Where there is a police-channel communication to the arresting officer, he acts in good faith thereon, and such knowledge and information exist within the department, the arrest is based on probable cause.

*Griffith v. State*, 788 N.E.2d 835, 840 (Ind. 2003) (citing *Whiteley v. Warden*, 401 U.S. 560, 91 S. Ct. 1031 (1971), and *Francis v. State*, 161 Ind. App. 371, 316 N.E.2d 416 (1974)); *see also Kindred v. State*, 524 N.E.2d 279, 292 (Ind. 1988) ("Probable cause should be determined on the basis of the collective information known to the law enforcement organization as a whole and not solely to the personal knowledge of the arresting officer," and discussing "police-channel communication.") (citing *Benton v. State*, 273 Ind. 34, 401 N.E.2d 697 (Ind. 1980); *Moody v. State*, 448 N.E.2d 660 (Ind. 1983); and *Hensley*). There was such a "police-channel communication" from Officer Faulk to Officer Addington in this case and, pursuant to *Heffner*, *Hensley*, and *Griffith*, we conclude the investigative stop could properly be "based upon the collective information known to the law enforcement organization as a whole." *L.W.*, 926 N.E.2d at 58.

[15]     Dunson directs us to *Jamerson v. State*, 870 N.E.2d 1051 (Ind. Ct. App. 2007), and *Murray v. State*, 837 N.E.2d 223 (Ind. Ct. App. 2005), *trans. denied*. In *Jamerson*, three police officers received a request over dispatch from an

unidentified detective to locate Jamerson, who was reportedly sitting in a vehicle behind a specific residence. The detective indicated he was seeking Jamerson in connection with a carjacking incident. Individuals in the residence behind which Jamerson was sitting had notified the police that Jamerson was there. Based on the detective's information, the three police officers approached Jamerson and detained him "for investigative purposes until the officers heard back from the county detective who had made the initial report." *Id.* at 1053. One of the officers then observed a handgun underneath Jamerson's car seat and seized it. Jamerson was charged with and convicted of carrying a handgun without a license. On appeal, Jamerson challenged the propriety of the investigatory stop.

[16] This court rejected the State's argument that the officers who detained Jamerson were acting "upon the police department's collective knowledge that Jamerson was wanted in connection with [a carjacking]." *Id.* at 1056. Instead, this court noted that the responding officers "did not know who the detective was who had related [the] information over dispatch, that the detective never responded or came to the scene, that [they were] not in touch with the detective, and that [they] had no firsthand knowledge of any conversations this detective had had." *Id.* at 1057. The court stated:

> While the report over dispatch did make an assertion of illegality, such assertion was not supported by any specific and articulable facts. Indeed the message over dispatch asserted only that Jamerson was wanted in connection with an alleged crime of carjacking . . . . Yet no facts accompanied such assertion, and

the detective making the assertions never followed up with his claims and has yet to be identified.

*Id.* Finally, this court noted that the officers who detained Jamerson "pointed to no statements or behaviors tending to corroborate Jamerson's link to the alleged carjacking." *Id.* at 1058. This court concluded: "the State has failed to demonstrate that Jamerson's reported link to the alleged illegal activity was anything more than an unparticularized hunch on the part of the unnamed reporting officer" and that the officers did not make an adequate showing of reasonable suspicion to justify detaining Jamerson. *Id.*

[17] *Jamerson* is readily distinguishable from Dunson's case. In *Jamerson*, the detective who broadcast a message regarding Jamerson's alleged involvement in a crime was unidentified. The record in that case contained no information regarding the facts that led the unidentified detective to suspect Jamerson was involved in the carjacking. None of the officers who detained Jamerson had any knowledge of information that could have linked Jamerson to the carjacking.

[18] In contrast, Officer Faulk was known to Officer Addington and was working in conjunction with Officer Addington and other officers to investigate the reports regarding a disturbance. Even though Officer Faulk did not explain the basis for her reasonable suspicion in her radio broadcast, she has done so subsequently, and that information is part of the record and available for review.

[19] In *Murray*, a law enforcement officer responded to a dispatch regarding a disturbance at a pool hall. When the officer arrived, witnesses reported Murray had gotten into a fight and described his appearance and the car in which he left. The officer then radioed dispatch and related that information. The officer additionally radioed a second law enforcement officer and gave him a description of Murray and Murray's vehicle and told the second officer that "he just needed to speak with Murray." *Murray*, 837 N.E.2d at 224. The second officer soon observed Murray's vehicle, initiated a traffic stop, and noticed Murray appeared to be intoxicated. The officer arrested Murray, and the State charged him with operating a vehicle while intoxicated. Murray filed a motion to suppress the evidence obtained as a result of the traffic stop, which the trial court granted. On appeal, this court affirmed the trial court's suppression order. This court concluded:

> The record reveals that [the second officer] received no information from [the first officer] that Murray had been or was involved in criminal activity before [the second officer] made his investigatory stop. [The first officer] merely radioed other units that he "needed to speak with the subject." In order to rely on collective knowledge, the knowledge sufficient for reasonable suspicion must be conveyed to the investigating officer before the stop is made. The collective knowledge cannot be relied upon after the fact. To hold otherwise would allow police officers to conduct investigatory stops before having any reasonable suspicion of criminal activity.

*Id.* at 226.

[20] While there may be some factual similarities between *Murray* and this case, we believe that the collective knowledge of the police, the description of Dunson and the motorcycle he was riding, and the totality of the circumstances sufficiently differentiate the case. We further believe that the United States Supreme Court's holding in *Hensley* and a number of our supreme court's decisions lead us to this conclusion.

[21] We believe that a rationale similar to the one Justice O'Connor articulated in *Hensley* can be applied to this case. *See Hensley*, 469 U.S. at 231, 105 S. Ct. at 681. Here, law enforcement officers were cooperating in investigating reports of a disturbance. Officers Faulk and Wren spoke to the victim while Officer Addington and Deputy Bennett detained a suspect. When Officers Faulk and Wren acquired information that Dunson may have been involved, they were outside their vehicles, and Dunson was travelling on a motorcycle. Officer Addington was nearby and available to assist his fellow officers. Requiring a law enforcement officer in Officer Faulk's position to relay the exact details of her reasonable suspicion would be cumbersome and impractical, if not dangerous, in situations such as this one where the officers are simultaneously investigating the possible commission of a crime, keeping the area safe, and attempting to apprehend possible suspects. Requiring the level of detail Dunson suggests is necessary could hamstring an officer's ability to effectively carry out his or her duties. Allowing officers to rely on the collective knowledge of the law enforcement organization is practical and leads to more efficient police work.

[22]  Based on our review of the totality of the circumstances, we conclude that Officer Addington's investigatory stop was supported by reasonable suspicion. After multiple people made 911 calls reporting a disturbance, which reportedly involved a number of men, some of whom had guns, several law enforcement officers responded to the calls. Officers Faulk and Wren spoke to Coleman, who was injured in and upset by the incident, while Officer Addington and Deputy Bennett detained another individual who may have been involved. While Officers Faulk and Wren were speaking to Coleman, Dunson rode past on his motorcycle, and the victim identified Dunson as someone who was involved in the incident. Officer Faulk, who was engaged in her investigation, communicated to her fellow law enforcement officers that Dunson may have been involved and called on them for assistance. Collectively, the officers had specific and articulable information from a known person—Coleman— regarding Dunson's involvement in the incident. That information was sufficient to lead an ordinarily prudent person to believe Dunson was involved in the criminal activity the officers were investigating. *See L.W.*, 926 N.E.2d at 55. Officer Addington thus had reasonable suspicion to detain Dunson in order to further investigate, and we conclude the trial court did not abuse its discretion by admitting the evidence seized as a result of the investigatory stop. [4]

[4] Officer Addington testified he observed Dunson driving at an unsafe speed, and Dunson contends Officer Addington's opinion that Dunson was speeding did not amount to reasonable suspicion that Dunson committed a traffic violation and did not justify the investigatory stop. Because we conclude the officers' collective knowledge amounted to reasonable suspicion, we need not determine whether Officer Addington had reasonable suspicion to believe Dunson was speeding.

# Conclusion

[23] The collective information known to the law enforcement organization was sufficient to provide reasonable suspicion that Dunson had been involved in criminal activity. The trial court did not abuse its discretion by admitting the evidence gathered as a result of the investigatory stop. We affirm.

[24] Affirmed.

Riley, J., and Bailey, J., concur.