

**FILED**

Jul 26 2016, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Phillips
Boonville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Clayton Doctor,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 26, 2016

Court of Appeals Case No.
82A01-1507-CR-844

Appeal from the Vanderburgh
Circuit Court

The Honorable Kelli E. Fink,
Magistrate

Trial Court Cause No.
82C01-1407-FA-806

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Clayton Doctor (Doctor), appeals the trial court's Order denying Doctor's motion to suppress the evidence seized during a traffic stop.

We affirm and remand for further proceedings.

## ISSUES

Doctor presents one issue on interlocutory appeal, which we restate as follows: Whether the trial court erred in denying his motion to suppress the evidence seized during the course of a traffic stop.

The State raises one issue on cross-appeal, which we restate as follows: Whether Doctor's interlocutory appeal should be dismissed because he did not timely file his Notice of Appeal.

## FACTS AND PROCEDURAL HISTORY

In February of 2014, Detective Cliff Simpson (Detective Simpson), a police officer with the Evansville Police Department's narcotics unit and "a federally deputized" officer with the Drug Enforcement Administration task force, received incriminating information about Doctor from an individual in federal custody. (Tr. p. 5). The source revealed to Detective Simpson that he had traveled to Dallas, Texas, with Doctor, where Doctor had "a hydraulic trap" installed "in the area of the front passenger's side compartment, airbag compartment" of a black Acura sedan. (Tr. p. 7). Then, in March of 2014, Detective Simpson received information from another confidential informant

that Doctor was transporting large quantities of cocaine from Atlanta, Georgia, to Evansville, Vanderburgh County, Indiana, for distribution. As part of his investigation into Doctor, Detective Simpson located the black Acura and applied to the United States District Court in the Southern District of Indiana to place a GPS tracking device on the vehicle. On May 14, 2014, Detective Simpson's request was granted, and he placed the tracker on the underside of the Acura. On June 19, 2014, upon Detective Simpson's application, the federal district court approved a forty-five-day extension to continue monitoring Doctor's vehicle via GPS.

[6] On June 24, 2014, the GPS device indicated that the Acura had been driven to Atlanta. For five days, the vehicle remained in Atlanta. On June 29, 2014, it appeared from the GPS unit that the Acura was leaving Atlanta and heading north. Believing that Doctor was returning to Indiana, Detective Simpson and several other officers set up surveillance points along the Pennyrile Parkway and U.S. 41 in Kentucky and southern Indiana. Detective Simpson was stationed at the Double Dukes Bar in Henderson, Kentucky, and at approximately 11:00 p.m., he identified Doctor's Acura driving by. Detective Simpson observed that the Acura, which was driving "maybe [thirty] miles an hour" at the time, "had dark tinted windows," and he "was unable to tell how many occupants were in the vehicle or who was driving the vehicle." (Tr. pp. 11, 26). Detective Simpson radioed to Officer Aaron Fair (Officer Fair) of the Evansville Police Department, who was stationed in Evansville in a marked police vehicle, and advised that the Acura was approaching and that its

windows were tinted too dark to identify the occupants. Once the Acura crossed the state line into Evansville, Officer Fair initiated a traffic stop based on a window tint violation.

[7] Officer Fair approached the vehicle and gathered information from the driver, who was identified as Doctor. Officer Fair subsequently returned to his vehicle to "conduct[] his normal business" for processing a traffic stop. (Tr. p. 47). Approximately "[a] minute" after Officer Fair initiated the stop, Motor Patrol Officer Lenny Reed (Officer Reed) and his K-9 partner, Willy (K-9 Willy), arrived on the scene. (Tr. p. 41). Officer Reed first observed the vehicle's window tint, noting that "[t]he occupants in the vehicle were not easily identifiable." (Tr. p. 41). As Officer Fair was seated in his squad car, Officer Reed approached the driver-side window of the Acura and learned that there was a passenger in the vehicle, identified as Jamal Grayson (Grayson). Officer Reed walked over to the passenger-side window and spoke with Grayson. During his conversation with Grayson, Officer Reed noticed "multiple air freshener[]s inside the vents, all of the vents in the vehicle, . . . multiple cell phones, . . . a prepaid phone card, . . . a hard travel appearance to the vehicle with multiple energy drinks and/or food wrappers strung throughout the vehicle." (Tr. pp. 43-44). Based on his observations, Officer Reed requested Doctor's consent to search the vehicle. Doctor responded that the vehicle did not belong to him.[1] After explaining to Doctor "that he was in control of the

---

[1] The officers verified that the Acura was registered to Joshlyn Simmons.

vehicle," Officer Reed again asked for consent to search the vehicle, and Doctor refused. (Tr. pp. 46-47).

[8] At this point, approximately five or six minutes into the traffic stop, Officer Reed "decided to deploy K-9 Willy to the free air space" around the vehicle. (Tr. p. 47). Prior to Officer Reed even commanding K-9 Willy to "dope seek," K-9 Willy "stopped to investigate" alongside the driver's door. (Tr. p. 48). K-9 Willy "stood on his hindquarters[] [and] tried to jump inside that driver's window." (Tr. p. 48). Officer Reed "noticed a demeanor change in [K-9] Willy such as his breathing rate, his nose popping, his tail set changing, those are things that are indicative of K-9 Willy being in narcotic odor." (Tr. p. 48). Officer Reed directed K-9 Willy to the front of the vehicle, near the passenger-side headlight, and gave him the "dope seek" command. (Tr. p. 49). The duo worked counter-clockwise around the vehicle, and K-9 Willy again stopped at the driver-side door and changed his demeanor to indicate the scent of narcotics. When they reached the passenger-side window, K-9 Willy, once again, rose up on his hindquarters with his nose up in the air and started scratching at the door. (Tr. p. 49). Officer Reed then "deployed [K-9] Willy to the interior of the vehicle." (Tr. p. 50). K-9 Willy climbed over all the seats before providing "an indication on the floorboard of the passenger's seat, like a final indication where he's staring at and scratching at." (Tr. p. 50). When redirected to the dashboard area, K-9 Willy nosed through the glovebox, which had been opened, and scratched at the passenger's seat, which indicated to Officer Reed that he was "smelling drugs." (Tr. p. 51).

[9] As Officer Reed returned K-9 Willy to his patrol vehicle, he stopped by Officer Fair's vehicle to inform Officer Fair that K-9 Willy had indicated the presence of narcotics. Officer Fair advised that he was writing out a warning citation for Doctor's window tint violation. K-9 Willy's indications were relayed to Detective Simpson, who applied for and obtained a warrant to search Doctor's vehicle. The Acura was transported to a crime scene garage so that the search could be conducted in a better-lit and less hazardous environment than alongside a highway. The search revealed a hydraulic trap (*i.e.*, a "hidden compartment") "in the front passenger's side airbag." (Tr. p. 14). After breaching the trap, the officers discovered "two heat sealed bags containing a white powdery substance," both of which "field tested positive for cocaine." (Tr. pp. 14-15).

[10] On July 1, 2014, the State filed an Information, charging Doctor with Count 1, dealing in cocaine, a Class A felony, Ind. Code § 35-48-4-1(a)(2)(C),(b)(1) (2013); and Count II, conspiracy to commit dealing in cocaine, a Class A felony, I.C. §§ 35-48-4-1(a)(2), (b)(1); -41-5-2 (2013). On November 12, 2014, Doctor filed a motion to suppress "any evidence obtained as a result of the search of [his] vehicle." (Appellant's App. p. 16). Doctor argued that "[t]he traffic stop exceeded the parameters set forth in *Terry v. Ohio*, [392 U.S. 1, 20 (1968)]; . . . the basis for making the traffic stop was pretextual; . . . [t]he search warrant obtained in his cause was not based on probable cause; and . . . [Doctor] was not advised of his constitutional rights." (Appellant's App. p. 16). On June 4, 2015, the trial court issued its Order, denying Doctor's motion to

suppress except to the extent "that any statements made by [Doctor] while in custody prior to the advisement of Miranda warnings and in response to interrogation are suppressed." (Appellant's App. p. 12).

On July 1, 2015, Doctor filed a motion to certify the trial court's Order for interlocutory appeal, which the trial court granted the same day. On July 31, 2015, our court accepted jurisdiction over this appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion to Dismiss*

On February 23, 2016, the State filed a Motion to Dismiss Appeal, claiming that Doctor's September 30, 2015 Notice of Appeal was filed after the deadline. On March 2, 2016, Doctor filed his response to the State's motion for dismissal. Doctor argued that his Notice of Appeal was timely "filed with this [c]ourt on July 6, 2015, as noted by the entry of the [c]lerk of this [c]ourt for July 6, 2015, stating: 'The appearance for atty. Mark Phillips was tendered in the form of a notice of appeal.'" (Appellant's Response to the State's Motion to Dismiss Appeal p. 1). Doctor contended that on September 30, 2015, his attorney communicated with the clerk's office "and was advised to file another Notice of Appeal[,]" which he did the same day. (Appellant's Response to the State's Motion to Dismiss Appeal p. 1). On March 17, 2016, having reviewed the matter, our court's motions panel denied the State's motion to dismiss.

[13] On cross-appeal, the State now claims that Doctor's appeal should be dismissed because he did not timely file a Notice of Appeal. Doctor, however, contends that this court, via its motions panel, has already considered the merits of this issue and denied the State's motion to dismiss. Although we are reluctant to do so "absent clear authority establishing that it erred as a matter of law[,]" it is well established that our court "has inherent authority" to reconsider any ruling by the motions panel "while an appeal remains *in fieri*." *Treacy v. State*, 953 N.E.2d 634, 636 n.2 (Ind. Ct. App. 2011) (citing *Davis v. State*, 771 N.E.2d 647, 649 n.5 (Ind. 2002), *abrogated on other grounds by In re Adoption of O.R.*, 16 N.E.3d 965 (Ind. 2014)), *trans. denied*; *Members v. State*, 851 N.E.2d 979, 981 n.2 (Ind. Ct. App. 2006).

[14] In this case, there is no dispute that Doctor's interlocutory appeal is discretionary rather than a matter of right. *See* Ind. Appellate Rule 14(A) (discussing interlocutory appeals of right). For a discretionary interlocutory appeal, Indiana Appellate Rule 14(B) sets forth a specific procedure for initiating the appeal. First, within thirty days of the trial court's issuance of an interlocutory order, a party must file a motion requesting that the trial court certify the order for an interlocutory appeal. App. R. 14(B)(1)(a). Thereafter, within thirty days of a hearing on the matter or, if no hearing is set, within thirty days of the request for certification, the trial court must rule or the motion for certification will be deemed denied. App. R. 14(B)(1)(e). Upon the trial court's certification, the moving party must request that our court accept jurisdiction over the appeal within thirty days. App. R. 14(B)(2)(a). "The

motion shall be accompanied by an appearance as required by [Appellate] Rule 16(H)." App. R. 14(B)(2). Within fifteen days of our court's order accepting jurisdiction over the interlocutory appeal, "[t]he appellant shall conventionally file a Notice of Appeal with the Clerk." App. R. 14(B)(3).

[15] Here, the trial court issued the interlocutory Order on June 4, 2015. On July 1, 2015, Doctor filed a motion with the trial court to certify the Order for interlocutory appeal, which the trial court granted the same day. On July 6, 2015, Doctor requested that our court accept jurisdiction over the interlocutory appeal, which we granted on July 31, 2015. Accordingly, pursuant to the Appellate Rules, Doctor's Notice of Appeal was due to be filed within fifteen days of July 31, 2015—*i.e.*, no later than Monday, August 17, 2015.

[16] Doctor directs our attention to the docket, which states that "[t]he appearance for atty. Mark Phillips was tendered in the form of a notice of appeal" on July 6, 2015. (Appellant's Reply Br. p. 2).[2] The Chronological Case Summary includes an entry on July 6, 2015, which states, "Notice of Appeal Received." (Appellant's App. p. 9). Although not included within the record submitted by the parties, the court's electronic filing system, Odyssey, contains a Notice of Appeal filed by Doctor on July 6, 2015.[3] Then, on September 30, 2015, after

---

[2] This notation is not included in the trial court's Chronological Case Summary; rather, it is noted on the court's electronic filing system, Odyssey.

[3] This Notice of Appeal was filed as an appearance, which is required to accompany a motion requesting that our court accept jurisdiction of an interlocutory appeal. App. R. 14(B)(2). The State does not acknowledge Doctor's July 6, 2015 Notice of Appeal.

apparently realizing that the Appellate Rules state that a Notice of Appeal is to be filed *after* the court accepts jurisdiction, Doctor filed a second Notice of Appeal. Accordingly, Doctor filed both a premature and a belated Notice of Appeal.

[17] Our court has previously determined that a premature filing of a Notice of Appeal "is simply a defect in form that is capable of being cured." *Ivy v. State*, 847 N.E.2d 963, 965 (Ind. Ct. App. 2006). We stated that if a premature filing does "not adversely affect the substantial rights of either party, the claimant's right to review [is] not forfeited." *Id.* In this case, we find that the premature Notice of Appeal did not adversely affect the State. Rather, the State received advanced notice that Doctor sought to appeal the Order, especially in light of the fact that Doctor filed a motion to certify the Order for interlocutory appeal and filed a motion with this court to accept jurisdiction. The defect was cured upon our court's acceptance of jurisdiction. Therefore, we conclude that Doctor's right to appeal should not be forfeited, and we uphold the order of our motions panel denying the State's motion to dismiss.

## II. *Motion to Suppress*

[18] Doctor claims that the evidence seized from his vehicle should have been suppressed because it was obtained pursuant to an illegal traffic stop. Our review of a trial court's ruling on a motion to suppress is similar to other sufficiency matters. *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006). Thus, "[t]he record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence, and we consider

conflicting evidence most favorably to the trial court's ruling." *Id.* However, we will "consider the uncontested evidence in a light most favorable to the appellant." *Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied.* Regarding the determination of reasonable suspicion to merit a warrantless search, our review is *de novo. Sanders v. State*, 989 N.E.2d 332, 334 (Ind. 2013).

[19] Doctor contends that the traffic stop violated the protections afforded by the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. In particular, he argues that the basis for the traffic stop—*i.e.*, a window tint violation—was pretextual. A "pretextual" traffic stop is "a stop that police instigate 'under the guise of enforcing the traffic code what they would like to do for other reasons.'" *Veerkamp v. State*, 7 N.E.3d 390, 396 (Ind. Ct. App. 2014) (quoting *Baldwin v. Reagan*, 715 N.E.2d 332, 338 (Ind. 1999)), *trans. denied.* Doctor posits that law enforcement "simply orchestrated a plan in which they could obtain the information necessary to secure a search warrant," and a "window tint violation was the only excuse they could come up with to justify the stop." (Appellant's Br. pp. 10, 15). According to Doctor, "[i]t would be an insult to the protections afforded individuals by the Fourth Amendment and [Article I, Section 11] of the Indiana Constitution to excuse the stop" because "[a] cunning trap was laid with patience and planning, and Doctor was snared." (Appellant's Br. p. 11).

A. *Fourth Amendment to the United States Constitution*

[20] The Fourth Amendment to the United States Constitution guarantees:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV. This protection is extended to the States via the Fourteenth Amendment. *Sanders*, 989 N.E.2d at 335. Accordingly, "a search warrant is a prerequisite to a constitutionally proper search and seizure." *Callahan v. State*, 719 N.E.2d 430, 434 (Ind. Ct. App. 1999). In the event of a warrantless search or seizure, the State bears the burden of proving that an exception to the warrant requirement exists. *Id.*

[21] A traffic stop is considered to be a seizure under the Fourth Amendment. *Bush v. State*, 925 N.E.2d 787, 789, *clarified on reh'g*, 929 N.E.2d 897 (Ind. Ct. App. 2010). It is well established that police may not initiate a stop for any conceivable reason, but rather must possess, "at least, reasonable suspicion [that] a traffic law has been violated or other criminal activity is afoot." *Id.* at 790. Whether a law enforcement officer had reasonable suspicion of a traffic law violation requires an "examination of the totality of the circumstances to determine whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." *Johnson*, 992 N.E.2d at 958. As long as there is an observable traffic violation, "the stop is valid whether or not the police officer would have otherwise made the stop but for ulterior suspicions or motives." *Santana v. State*, 10 N.E.3d 76, 78 (Ind. Ct. App. 2014).

[22]     In this case, Officer Fair initiated a traffic stop based on a purported violation of Indiana's Window Tint Statute, which provides:

> A person may not drive a motor vehicle that has a:
> (1) windshield;
> (2) side wing;
> (3) side window that is part of a front door; or
> (4) rear back window;
> that is covered by or treated with sunscreening material or is tinted to the extent or manufactured *in a way that the occupants of the vehicle cannot be easily identified or recognized through that window from outside the vehicle*. However, it is a defense if the sunscreening material applied to those windows has a total solar reflectance of visible light of not more than twenty-five percent (25%) as measured on the nonfilm side and light transmittance of at least thirty percent (30%) in the visible light range.

I.C. § 9-19-19-4(c) (2013) (emphasis added).

[23]     In *Sanders*, 989 N.E.2d at 334-35, the defendant challenged the propriety of a traffic stop based on the Window Tint Statute, which ultimately led to the discovery of cocaine in the defendant's possession. The defendant hired an expert to inspect the window tint, and it was determined that the defendant's tint did, in fact, comply with the statute. *Id.* at 335. The supreme court found that the subsequent determination that the window tint did not violate the statute did "not serve to vitiate the legality of the traffic stop." *Id.* Because the officer "could not 'clearly recognize or identify the occupant inside,'" along with "the fact that the actual tint closely borders the statutory limit," the *Sanders* court concluded that the officer had reasonable suspicion to conduct a traffic stop. *Id.* Similar to *Sanders*, both Detective Simpson and Officer Reed testified

that they were unable to see who was driving the vehicle or identify the number of occupants therein. Although Officer Fair did not testify at the suppression hearing in order to inform the court of his reasons for conducting the traffic stop, Detective Simpson testified that he had communicated with Officer Fair that he had just observed Doctor's vehicle drive by and could not see through the window. *See L.W. v. State*, 926 N.E.2d 52, 58 (Ind. Ct. App. 2010) ("[A]n investigative stop may be based upon the collective information known to the law enforcement organization as a whole.").

[24] Doctor now argues that a violation of the Window Tint Statute cannot serve to justify the traffic stop because "there was no testing done to verify the percent of window tint" and because Detective Simpson had previously observed Doctor driving the Acura and was clearly able to identify him on those occasions. (Appellant's Br. pp. 7-8). In *Sanders*, it was the defendant who presented evidence of an expert witness to contradict the testimony of the police officers, while, here, Doctor offered no evidence to indicate that his window tint actually complied with the statute. *See Sanders*, 989 N.E.2d at 335. Furthermore, evidence that Doctor's window tint complied with the Window Tint Statute would serve to absolve him of the window tint violation, but it would not negate the officers' reasonable suspicion based on their observations. *See id.* Additionally, although Detective Simpson did indicate that he had previously seen Doctor driving the Acura, he clarified that Doctor's windshield was not tinted, so he was able to see Doctor driving by "[l]ooking through the front windshield in daylight." (Tr. p. 34). Conversely, on the night of the traffic

stop, when the vehicle passed by Detective Simpson, he only had a view of the Acura's tinted side windows. Based on the wording of the statute, it is a violation if any one window is tinted to the extent that an occupant cannot be recognized "through that window." I.C. § 9-19-19-4(c) (2013). As we are to consider the evidence before us in a light most favorable to the trial court's ruling, we find that the officers' testimony that they could not see the occupants inside of the Acura provided reasonable suspicion to justify the traffic stop.

[25] Nonetheless, even where a traffic stop is valid at its inception, it may violate the protections of the Fourth Amendment "if its manner of execution unreasonably infringes interests protected by the Constitution." *Bush*, 925 N.E.2d at 790 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Specifically, a traffic stop 'that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" *Id.* (quoting *Myers v. State*, 839 N.E.2d 1146, 149 (Ind. 2005)). Doctor now alleges that Officer Fair "intentionally withheld completion of the traffic stop in order to allow Officer Reed to further the investigation." (Appellant's Br. p. 9).

[26] We find no basis for Doctor's accusation in the record. Rather, the only evidence presented indicated that while Officer Fair was in his vehicle "conducting his normal business" for a traffic stop—*i.e.*, to issue a warning citation for Doctor's tinted windows, Officer Reed deployed K-9 Willy to sniff around the vehicle. (Tr. p. 47). *See, e.g.*, *Johnson*, 992 N.E.2d at 959 ("Officers who stop a vehicle for a suspected violation of the Window Tint Statute are

permitted to briefly detain a motorist to, among other things, request a driver's license and vehicle identification and conduct a license plate check."). According to Officer Reed, he arrived on scene approximately one minute after Officer Fair initiated the stop, and by the time Officer Reed returned K-9 Willy to his patrol vehicle, Officer Fair was still working on the warning citation. *See Bush*, 925 N.E.2d at 790 (noting that it would be a Fourth Amendment violation to unreasonably prolong a traffic stop in order for a canine sniff to be carried out "absent reasonable suspicion of criminal activity in addition to the traffic violation"). At this point, Officer Reed estimated that the stop had been ongoing for "probably [eight] to [ten] minutes, [twelve] minutes maybe." (Tr. p. 51).

[27] Officer Reed testified that the duration of a traffic stop is contingent upon multiple factors, such as "the time of the day or the city, . . . business, traffic on the radio, getting on the radio, things of that nature." (Tr. pp. 57-58). When presented with a hypothetical traffic stop for a window tint violation—and acting under the assumption that the driver had a valid driver's license, no outstanding warrants, and was lawfully in possession of the vehicle—Officer Reed opined that a normal traffic stop might take five to ten minutes. Here, no evidence was presented to establish that the eight-to-twelve-minute period was an unreasonable amount of time for a traffic stop.

[28] As a final note, in response to Doctor's suggestion that "the law enforcement officers involved in the detention, search and seizure of the black Acura and the subsequent arrest of Doctor simply skipped over the search warrant procedure,"

we point out that, following the legal traffic stop, K-9 Willy conducted a sniff around the vehicle and indicated the presence of narcotics. (Appellant's Br. p. 15). "The 'automobile exception' to the warrant requirement allows police to search a vehicle without obtaining a warrant if they have probable cause to believe evidence of a crime will be found in the vehicle." *State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010). K-9 Willy's sniff provided probable cause that the vehicle contained illicit drugs. *See id.* at 1286. Even though the officers took the additional step of obtaining a warrant prior to searching the vehicle, they would have been justified in conducting the search based on K-9 Willy's positive indications alone. Therefore, we conclude that the traffic stop did not run afoul of the Fourth Amendment to the United States Constitution.

## B. *Article I, Section 11 of the Indiana Constitution*

Doctor also challenges the validity of the traffic stop under Article I, Section 11 of the Indiana Constitution. This provision is "almost identical in text to its federal counterpart." *State v. Washington*, 898 N.E.2d 1200, 1205 (Ind. 2008). Nevertheless, Article I, Section 11 of the Indiana Constitution requires a separate and independent analysis as "the Indiana Constitution may protect searches that the federal Constitution does not." *Id.* at 1206. "When police conduct is challenged as violating this section, the burden is on the State to show that the search [or seizure] was reasonable under the totality of the circumstances." *Id.* Relevant considerations in determining the reasonableness of a search or seizure "turns on a balancing of: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion

the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Johnson*, 992 N.E.2d at 959 (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[30] Although Doctor fails to set forth the aforementioned considerations for analyzing an Article 1, Section 11 claim, he argues that the totality of the circumstances does not support the traffic stop because there is no evidence that the confidential informants who provided information about Doctor to Detective Simpson were reliable, nor is there any indication that the officers corroborated the informants' tips. Doctor also asserts that Officer Reed's testimony that the vehicle had "a hard travel appearance" was insufficient to pursue a narcotics investigation. (Tr. p. 44). We need not address these contentions because our court has previously considered this issue and determined that "there are legitimate law enforcement and safety interests in prohibiting the operation of vehicles with excessive window tinting, and police officers are entitled to enforce the statute." *Johnson*, 992 N.E.2d at 959. Therefore, we conclude that the traffic stop was not contrary to Article I, Section 11 of the Indiana Constitution because the officers acted reasonably under the totality of the circumstances based on the fact that they observed a valid traffic violation, and the officers did not unnecessarily extend the length of the traffic stop in order to acquire probable cause to search the vehicle.

## CONCLUSION

[31] Based on the foregoing, we conclude that Doctor has not forfeited his right to appeal based on an untimely Notice of Appeal; therefore, the State's motion to

dismiss is denied.  We further conclude that the basis for the traffic stop did not violate Doctor's constitutional rights; therefore, the trial court appropriately denied his motion to suppress.

[32] Affirmed and remanded for further proceedings.

[33] Kirsch, J. and Pyle, J. concur