# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 21 2018, 10:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Zachary J. Stock, Attorney at Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Stephen R. Sines, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | November 21, 2018 <br><br> Court of Appeals Case No. <br> 18A-CR-958 <br><br> Appeal from the Hendricks Circuit Court <br><br> The Honorable Daniel F. Zielinski, Judge <br><br> Trial Court Cause No. <br> 32C01-1608-F2-9 |

**Robb, Judge.**

# Case Summary and Issues

[1]    Following a jury trial, Stephen Ray Sines was convicted of dealing in methamphetamine, a Level 2 felony; possession of methamphetamine, a Level 3 felony; unlawful possession of a syringe, a Level 6 felony; possession of marijuana, a Class B misdemeanor; and possession of paraphernalia, a Class C misdemeanor. The trial court sentenced him to an aggregate twenty-five-year sentence. Sines appeals, raising two issues for our review which we restate as: (1) whether the trial court abused its discretion in admitting certain evidence; and (2) whether a second trial violated prohibitions against double jeopardy. Concluding the trial court did not abuse its discretion in admitting certain evidence and a second trial did not violate prohibitions against double jeopardy, we affirm.

# Facts and Procedural History

[2]    On August 1, 2016, around 3:45 a.m., Detective Dirk Fentz of the Brownsburg Police Department observed a vehicle speeding and fail to signal a turn. Detective Fentz conducted a traffic stop on the vehicle, which was driven by Iran Taylor and occupied by Sines in the passenger seat and Justin Martin on the rear driver's side.

[3]    Detective Fentz spoke with Taylor through the driver's side window and described him as "[q]uiet, nervous, you could see him sweating from his forehead. And his hands were shaking when he was giving me his driver's

license." Transcript, Volume 3 at 81. Neither Sines nor Martin made eye contact with Detective Fentz as he approached the vehicle and they both "lit up cigarettes as soon as [he] basically initiated [his] lights[.]" *Id*.

[4] Detective Fentz asked Taylor to join him in his police SUV. While Detective Fentz performed a records check through dispatch, Taylor continued to sweat, occasionally wiping the palms of his hands on his pant legs. Detective Fentz asked if "there was anything illegal in the vehicle[.]" *Id*. at 83. Taylor admitted there were three hypodermic needles that had been used for heroin and consented to a search of the vehicle. At the time of Taylor's consent to search, Detective Fentz had completed one written warning for a traffic infraction and was halfway through a second. Three additional officers arrived and Detective Fentz instructed one of them to request a canine officer to come to the scene. The canine officer was requested thirty-three minutes after the initial traffic stop.

[5] During this same time, officers also discovered that Martin was wanted on an outstanding arrest warrant. After Martin was removed from the vehicle and placed in handcuffs, he asked "if it was something to do with the warrant for his arrest" and explained he was the victim of identity theft. *Id*. at 87. Martin denied having any possessions in the vehicle and similarly consented to a search.

[6] Detective Fentz explained to Sines that Taylor had admitted to the presence of syringes in the vehicle and that Taylor and Martin had both consented to a

search. Sines exited the vehicle but refused a request to search a black leather bag and a camera box in the trunk, which he stated were his property. Detective Fentz began searching the passenger compartment of the vehicle and found "6 or 7 needles and small digital scale." *Id*. at 92. The needles appeared "used" and "dirty." *Id*. at 94. Detective Fentz then opened the vehicle's trunk and Sines responded, "what are you doing, I don't want you searching my property[.]" *Id*. at 95.

[7] Detective Fentz removed a black leather bag and a camera box from the trunk, Sines confirmed they were his property, and Detective Fentz placed the items next to the rear passenger-side tire of the vehicle. Detective Fentz then noticed "two needles in [the trunk], one used and one broken needle underneath where [Sines'] property had been sitting." *Id.* at 95. There were two plastic crates remaining in the trunk and Sines stated that one of the crates belonged to him. Detective Fentz placed Sines' plastic crate with the rest of his property.

[8] Around 4:30 a.m., forty-five minutes after the traffic stop was initiated, Officer Nathan Hibshman arrived on scene with his canine partner. Detective Fentz stated that at this point:

> I was still searching the trunk of the vehicle, there was [sic] numerous items, a lot of trash in the trunk so it took a while to search. When we search these cars, especially when we find needles, you kind of take your time because you don't want to get stuck, so you are literally picking up things and moving things out of the way, not just grabbing things. Searches take a lot longer now than they used to because of the danger of the needles and things like that.

*Id.* at 101. Officer Hibshman conducted a canine sniff of Sines' property that had been placed on the sidewalk. During the canine sniff, Sines informed officers there were syringes in his bag and the canine alerted on Sines' black leather bag.

[9] A search of Sines' black leather bag revealed approximately 85 grams of methamphetamine, 18 grams of marijuana, an electronic scale, "hundreds if not a thousand little plastic bags[,]" two syringes, and other paraphernalia. *Id.* at 113. The paraphernalia included a rubber arm tourniquet, pills, cotton balls, and a tin of small straws. An officer later testified the methamphetamine possessed a street value of $8,000 to $10,000 if sold by the gram.

[10] Sines and Taylor were arrested following the search. According to Detective Fentz, officers had been attempting to corroborate Martin's story of identity theft throughout the traffic stop:

> It had been back and forth. We believed that he was telling the truth. We were trying to get Marion County dispatchers to confirm whether this was valid or not, and eventually concluded that they couldn't decide for sure if he should be arrested or not. So, at that time, once we completed everything, we were just going to set him free. We knew where he lived in town, so if we needed to go pick him back up we could.

Tr., Vol. 2 at 25. Martin was released from the scene while Taylor and Sines were transported to the jail.

[11] On August 1, 2016, the State charged Sines with dealing in methamphetamine, a Level 2 felony; possession of methamphetamine, a Level 3 felony; unlawful

possession of a syringe, a Level 6 felony; possession of marijuana, a Class B misdemeanor; and possession of paraphernalia, a Class C misdemeanor. On September 7, 2017, Sines filed a motion to suppress the evidence obtained from the search, arguing the length of the seizure violated his constitutional rights. The trial court conducted a suppression hearing on November 6 and took the motion under advisement.

[12]    A jury trial commenced the next day, November 7. During cross-examination of Detective Fentz, defense counsel asked if he ever personally observed Sines with the contraband and whether Sines ever admitted that the contraband, as opposed to the containers in which the contraband items were found, was his. Defense counsel also asked if Detective Fentz was aware of Sine's poor eyesight or the fact that he did not have his glasses on during the traffic stop.

[13]    After the trial had concluded for the day, the State sent defense counsel the following email:

> I had not intention [sic] to introduce this evidence in my case in chief (nor do I still at this point) but I want to make you aware that there are several jail calls that may become pertinent as rebuttal/impeachment evidence. Sines has made several calls where he admits that the bags were his, the black leather bag and the camera case. Should he testify contrary to that, I do intend to introduce the portions of those jails [sic] calls where he made those statements as rebuttal/impeachment. There are also several calls where he indicates that his plan is to get the other occupants of the vehicle on the jail calls and have them say it was their bag because he knows the calls are recorded and then he can create reasonable doubt by using those calls.

> In addition to the rebuttal value of these calls, they also put you on notice that you cannot intentionally present perjured testimony to the jury if you plan to have Sines testify that the bags [sic] were not his.
>
> I am happy to play the calls for you.

Defense Exhibit A.

[14] At the beginning of the second day of trial, defense counsel informed the trial court of the State's email and requested a mistrial, explaining that the existence of the evidence "may have changed my entire defense." Tr., Vol. 2 at 206. Defense counsel also requested that the trial court prohibit the State from retrying the case, claiming a retrial would violate constitutional double jeopardy protections.

[15] The State responded that it did not commit a discovery violation because, pursuant to a prior court order, the defense was ordered to disclose all defense theories and the State had not been provided any defense theory whatsoever. Moreover, the State argued that every pretrial deposition indicated that Sines stated the bag was his and the State

> had absolutely no anticipation that he was going to suddenly say that these were not his bags, and the only way I found out that he was going to say this is during cross examination of . . . Detective Fentz. So, what I did is I immediately went back and the first thing I did . . . when I got back . . . I sent [defense counsel] an e-mail to let him know that I knew about this information.

*Id.* at 207-08.

After hearing argument on Sines' motion for a mistrial, the trial court concluded:

> The fault of this is completely on [Sines]. If this goes to trial again, I'm going to grant a mistrial, but I want the record to be clear it is not because the State did anything unethical or anything like that, but to preserve the record and to not have to come back here in six months for another trial, I'm going to grant a mistrial. If this case goes to trial again, there will not be another mistrial, because the defendant is lying to his attorney.
>
> * * *
>
> I want to make it very very clear . . . that my decision is not based on the conduct of the Prosecutor's office. It's based on the conduct of [Sines] who put his own self in jeopardy. And anyway, if this goes to trial again, if he's found guilty, he's paying the cost of this jury and the next jury. One more time, this is not a reflection in any way on the Officer, on any of the witnesses, on the Prosecutor's [sic] and the Prosecutor's Office. This is a direct reflection on [Sines] who lied to two court appointed attorneys. . . . He had two finest attorneys, defense attorneys, in the State. [State] make your record, but I want you to know this is not a reflection on your office or your ability. This is something that I think constitutionally I have to do. If I don't do, this is going to go to the Court of Appeals, then it's going to go to the Supreme Court, and then it's going to come back here.

*Id.* at 212-13.

A second trial was conducted in February 2018. During the trial, Sines renewed the pre-trial suppression motion and lodged a continuing objection to

the admission of the disputed evidence obtained as the result of the search. The trial court overruled the objection and concluded the search occurred "in a reasonable amount of time" based on the officer's conduct. Tr., Vol. 3 at 112. The State also played excerpts from several of Sines' jail calls, including the following admission:

> When the uh cop approached the vehicle he asked me about you know did I have anything in the vehicle, I told him yes. I told him I had a black bag uh uh a black uh uh briefcase type uh uh [inaudible] and a brown camera case but uh I had I got from somebody and um that was it.

Tr., Vol. 4 at 142.

[18] The jury found Sines guilty as charged and the trial court merged Sines' conviction of possession of methamphetamine, a Level 3 felony, into his conviction of dealing in methamphetamine, a Level 2 felony, and sentenced Sines to twenty-five years executed in the Indiana Department of Correction for dealing in methamphetamine with concurrent sentences on the remaining counts. Sines now appeals.

# Discussion and Decision

# I. Admission of Evidence

Sines first claims the trial court erroneously admitted evidence in violation of the Fourth Amendment to the United States Constitution.[1] We disagree.

## A. Standard of Review

Although Sines presented a pretrial motion to suppress, he did not seek interlocutory review of that decision. Thus, we consider his appeal as a review of the trial court's decision to admit evidence at trial. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013) ("Direct review of the denial of a motion to suppress is only proper when the defendant files an interlocutory appeal.").

> In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. It also considers the evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and reverse only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial

---

[1] Although Sines objected at trial on the basis of both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, and he similarly frames the issue on appeal, Sines' arguments focus only on the Fourth Amendment and, with the exception of several citations to Article 1, Section 11, he does not provide a separate *Litchfield* analysis for our review. *See Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) (reasonableness of a search or seizure under the Indiana Constitution turns on a balance of three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs"). Accordingly, we apply only a Fourth Amendment analysis here. *See Williams v. State*, 724 N.E.2d 1093, 1097 n.5 (Ind. 2000) (concluding state constitutional claim was waived where the appellant failed to provide "independent analysis supporting a separate standard under the state constitution").

rights. But the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo.

*Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (citations and quotations omitted). Furthermore, we "may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court." *Harris v. State,* 19 N.E.3d 298, 301 (Ind. Ct. App. 2014), *trans. denied.*

## B. Search and Seizure

[22] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This protection is extended to the States via the incorporation doctrine of the Fourteenth Amendment. *Sanders v. State*, 989 N.E.2d 332, 335 (Ind. 2013). Under the Fourth Amendment, warrantless searches and seizures are per se unreasonable, subject to a "few specifically established and well-delineated exceptions." *Katz v. U.S.*, 389 U.S. 347, 357 (1967). The State bears the burden of proving that an exception to the warrant requirement exists at the time of the search or seizure. *Doctor v. State*, 57 N.E.3d 846, 853 (Ind. Ct. App. 2016). "A traffic stop is considered to be a seizure under the Fourth Amendment." *Id*. Where, as here, the defendant was a passenger in a vehicle subject to a traffic

stop, the passenger may challenge any part of the traffic stop because they are seized when the driver is seized. *Brendlin v. California*, 551 U.S. 249, 255 (2007).

[23] Sines does not dispute the propriety of the underlying traffic stop; rather, he argues that his seizure was unconstitutionally prolonged when officers conducted a canine sniff of his property. Indeed, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). And, although a dog sniff is not a search protected by the Fourth Amendment, *id*. at 409, "[w]here a car is searched and contraband is discovered after a dog sniff of the vehicle, discovery of the contraband may be the product of an unconstitutional seizure if the sniff occurred during an unreasonably prolonged traffic stop." *Wells v. State*, 922 N.E.2d 697, 700 (Ind. Ct. App. 2010), *trans. denied*.

[24] In *Rodriguez v. U.S.*, the Supreme Court explained the tolerable duration of a seizure is dictated by the seizure's particular "mission." 135 S.Ct. 1609, 1611 (2015). In the context of a traffic stop, an officer's mission is to address the underlying traffic violations that warranted the stop and attend to related safety concerns. *Id.* This includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. *Id.* at 1615. While "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly[,]" a canine sniff, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.*

(quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).  The Court reiterated its holding in *Caballes*, that a traffic stop "prolonged beyond" the "time reasonably required to complete [the stop's] mission" is "unlawful."  *Id.* at 1616 (quoting *Caballe*s, 543 U.S. at 407).  And the Court went on to explain:

> The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop.

*Id.* (quotations omitted).

[25]  Relying primarily on the forty-five-minute period between the initial traffic stop and the arrival of the canine officer, Sines argues the tasks related to the traffic stop should have been completed "well before the [canine] unit arrived[,]" and the traffic stop was therefore "unreasonably prolonged and ultimately unconstitutional."  Appellant's Brief at 11.

[26]  The initial facts of this traffic stop are analogous to those of *Graham v. State*, 971 N.E.2d 713 (Ind. Ct. App. 2012), *trans. denied*.  There, as an officer prepared the defendant a traffic citation, the officer asked the defendant if there were any weapons or drugs in the vehicle and the defendant admitted to the possession of illegal substances.  On appeal, the defendant argued the time of the traffic stop—fifty-eight minutes—was "unreasonably prolonged prior to the officer inquiring about the presence of weapons or guns."  *Id*. at 717.  We disagreed and concluded that when the defendant revealed his possession of illegal

substances, "the nature of the stop went from that of a simple traffic stop to a detention based on criminal activity[.]" *Id.*

[27] Similarly here, Detective Fentz asked Taylor about the presence of drugs prior to completing the second traffic warning and Taylor admitted there were three syringes that had been used for heroin in the vehicle. Taylor's admission thereby transformed the traffic stop into a detention based on criminal activity and officers developed probable cause to search the vehicle pursuant to the automobile exception. *See Carroll v. U.S.*, 267 U.S. 132, 159 (1925) (holding a warrantless search of a vehicle is permissible under the automobile exception to the Fourth Amendment where police possess probable cause). Unlike *Graham*, however, Taylor also consented to a search of the vehicle. This provided officers with a second, independent exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (holding a warrantless search based on lawful consent is consistent with the Fourth Amendment). Officers instructed Sines to exit the vehicle and Detective Fentz found syringes in a bag retrieved from the backseat. Detective Fentz then continued his search of the vehicle and located Sines' property in the trunk. Sines identified his property but declined consent to search.

[28] In light of the two, independent exceptions to the warrant requirement at issue here, we pause briefly to emphasize their divergence regarding the property of a third person. We begin with the automobile exception as discussed in *Wyoming v. Houghton*, 526 U.S. 295, 297 (1999). There, during a traffic stop for a driving infraction, an officer noticed a syringe in the driver's pocket and the driver

admitted that he used the syringe for illegal drugs. *Id.* at 298. The officer then ordered the driver and two female passengers out of the car and conducted a probable cause search of the car for contraband under the automobile exception. *Id.* The officer found a purse on the back seat, searched it, and discovered drug paraphernalia and methamphetamine. *Id.* One of the vehicle's passengers, Houghton, admitted the purse belonged to her and Houghton later challenged the search on Fourth Amendment grounds.

[29] In upholding the search of the passenger's purse, the Supreme Court declined to distinguish between a passenger's belongings and the driver's belongings even though the officer's suspicion of the *driver's* criminal conduct was the basis of the search. *Id.* at 302-06. The Court held, "officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." *Id.* at 307. The Court premised its decision based upon the scope of warrantless search principles articulated in *United States v. Ross,* 456 U.S. 798, 825 (1982) (holding, "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). *Id.* at 302.

[30] Shortly after *Houghton*, this court explained that a driver's consent to search a vehicle does not extend to the property of third persons within the vehicle, absent an objectively reasonable basis to believe the driver had the authority to consent to a search of the third person's property. *State v. Friedel*, 714 N.E.2d 1231, 1240 (Ind. Ct. App. 1999). In *Friedel*, the driver of the vehicle consented

to a search while accompanied by several passengers. As in *Houghton*, officers found a purse, searched it, and discovered methamphetamine. *Id*. at 1235. We held the search violated the Fourth Amendment because the driver's consent did not provide a valid consent to search the property of a third party and it was "unreasonable for the officers to conclude that it did." *Id.* at 1243.

[31] Applying *Houghton* and *Friedel* to facts presented here, because Sines' property was "capable of concealing the object of the search[,]" *Houghton,* 526 U.S. at 307—i.e., narcotics, syringes, and related paraphernalia—Sines' professed ownership of the property and his refusal to consent to a search was immaterial. Put another way, the property was subject to the search of Taylor's vehicle regardless of whether it belonged to a third party. Therefore, officers did not conclude their search of Taylor's vehicle under the automobile exception until they searched Sines' property and the fact that officers chose to take the additional step of obtaining a canine sniff served only to further protect Sines' Fourth Amendment rights—not infringe upon them.

[32] Furthermore, because officers discovered syringes underneath Sines' property in the trunk, even if we were to assume officers lacked probable cause and the search was based solely on Taylor's consent, Sines' argument would still fail. This discovery provided officers with reasonable suspicion specific to Sines, and officers were thereby permitted to prolong the traffic stop and obtain a canine sniff. *Rodriguez,* 135 S.Ct. at 1615 (officers may prolong traffic stop so long as "reasonable suspicion ordinarily demanded to justify detaining an individual" is present).

[33] Although it is true we must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly," *U.S. v. Sharpe*, 470 U.S. 675, 686 (1985), the record reflects the canine sniff did not, in fact, prolong the traffic stop. At the point the canine officer arrived on scene, Detective Fentz testified he was still searching the trunk of the vehicle because there were a lot of items and trash in the trunk to carefully look through due to the possible presence of needles. *See* Tr., Vol. 3 at 101. Officers were also still attempting to corroborate Martin's story that he was the victim of identity theft and that his warrant was issued in error.

[34] In light of the confusion regarding Martin's warrant and the presence of multiple syringes requiring officers to conduct a slower, more methodical search of the vehicle due to officer safety concerns, we cannot conclude that officers acted unreasonably. Therefore, the trial court's finding that the search occurred "in a reasonable amount of time[,]" tr., vol. 3 at 112, was not clearly erroneous. And, as neither Sines' seizure nor the subsequent search of his property violated the Fourth Amendment, we cannot conclude the trial court abused its discretion in admitting the fruits thereof.

## II. Double Jeopardy

[35] Next, Sines argues his second trial violated constitutional prohibitions on double jeopardy because the State "knowingly or intentionally caused the defense to seek the early termination of the first trial." Appellant's Br. at 14. Again, we disagree.

# A. Standard of Review

[36] Both the United States and Indiana Constitutions forbid the State from placing a person twice in jeopardy. U.S. Const. amend. V; Ind. Const. Art. 1, § 14. Indiana Code section 35-41-4-3 elaborates on this provision, in relevant part:

> (a) A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> * * *
>
>> (2) the former prosecution was terminated after the jury was impaneled and sworn . . . unless (i) the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination, (ii) it was physically impossible to proceed with the trial in conformity with law, (iii) there was a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law, (iv) prejudicial conduct, in or outside the courtroom, made it impossible to proceed with the trial without injustice to either the defendant or the state, (v) the jury was unable to agree on a verdict, or (vi) false statements of a juror on voir dire prevented a fair trial.
>
> (b) If the prosecuting authority brought about any of the circumstances in subdivisions (a)(2)(i) through (a)(2)(vi) of this section, with intent to cause termination of the trial, another prosecution is barred.

Therefore, if a defendant moves for a mistrial, he forfeits any double jeopardy claim unless "the motion for mistrial was necessitated by governmental conduct

intended to goad the defendant into moving for a mistrial." *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996) (quotations omitted). If the prosecutor acted with the requisite intent, then double jeopardy bars a retrial. *Wilson v. State*, 697 N.E.2d 466, 472 (Ind. 1998). Although a trial court's determination of prosecutorial intent is not conclusive for purposes of appellate review, we regard its determination as "very persuasive." *Id*. at 473. This is a factual determination that we review under a clearly erroneous standard. *Butler v. State,* 724 N.E.2d 600, 604 (Ind. 2000).

## B. Retrial

[37] On appeal, Sines argues the State's late disclosure of incriminating evidence presented him with a Hobson's choice: either proceed with the trial contesting ownership of the bag—a theory rendered "problematic if not completely untenable" by the State's disclosure—or request a mistrial in which case the State would be able to retry him for the offense. Appellant's Br. at 16. Thus, Sines argues the State "commandeered at least one aspect of the defense[,]" *id*., and the trial court's finding was therefore clearly erroneous.

[38] As an initial matter, Sines fails to establish the State's late disclosure of evidence was improper. At trial, Sines repeatedly argued the State's late disclosure constituted a discovery violation. *See* Tr., Vol. 2 at 200-01. And on appeal, Sines' argument simply assumes the State was required to turn over the evidence without citation to discovery requests or orders in the record. *See* Ind. Appellate Rule 46(A)(8) (providing that the argument section of the appellant's

brief must "contain the contentions of the appellant on the issues presented, supported by cogent reasoning[,]" along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts under review). Although Sines has failed to demonstrate the State committed a discovery violation,[2] the disclosure's effect on the defense was clear and a mistrial was therefore an appropriate remedy. *See Coleman v. State,* 750 N.E.2d 370, 374 (Ind. 2001) (noting the overriding concern is whether the defendant was so prejudiced that he was placed in a "position of grave peril" to which he or she should not have been subjected).

[39] Sines presents several circumstantial arguments aimed at showing the State intended to "goad" him into requesting a mistrial. Sines begins by detailing the defense's theory of the case, which he claims had become evident to the State through the content of his opening statement as well as defense counsel's cross-examination of Detective Fentz. Sines then contends the State's disclosure was intended to derail this theory, rhetorically asking, "Why else would [the State] send the email?" Appellant's Br. at 16. And, as evidence a retrial was the State's desired outcome, Sines points to the fact that the State did not oppose his request for a mistrial, as the State had only requested that the trial court find that "[j]eopardy is not attached." Tr., Vol. 2 at 216. Sines further argues,

---

[2] With that said, we also take this opportunity to remind counsel—both prosecutors and defense attorneys—that the Indiana Trial Rules "are designed to allow liberal discovery." *Beville v. State*, 71 N.E.3d 13, 18 (Ind. 2017) (quotations omitted). Thus, when in doubt, counsel should err on the side of disclosure.

"[o]ne might infer from this that the [State] was pleased to get a second chance." Appellant's Br. at 17.

[40] Contrary to Sines' contention, however, we do not view defense counsel's opening argument to have put the State on notice of the theory of Sines' defense. Defense counsel merely argued the State lacked fingerprints, video records, or DNA evidence to prove Sines owned the property. Therefore, the State may have reasonably viewed defense counsel's opening statement as nothing more than highlighting reasonable doubt. This is especially true considering pretrial discovery indicated Sines would not contest his initial declaration of ownership of the property. Despite a court order that the defense turn over all defense theories, it had failed to do so, and several depositions had confirmed Sines' professed ownership of the property.

[41] As the State argued before the trial court, it had "absolutely no anticipation that [Sines] was going to suddenly say that these were not his bags[.]" Tr., Vol. 2 at 207. It was only after defense counsel's cross-examination of Detective Fentz that the State became aware of the new defense theory and it promptly notified the defense of Sines' incriminating statements by email. Indeed, as our supreme court has explained, the "very nature of a trial gives rise to the likelihood that issues will be raised during the primary phase which the State could not logically anticipate." *Smith v. State*, 553 N.E.2d 832, 835 (Ind. 1990).

[42] We also disagree with Sines' argument that the State's failure to object to his motion for a mistrial inferred a mistrial was the State's desired outcome.

Although this inference is often reasonable—if not obvious—from the record, we believe the State's actions demonstrated prudence by promptly disclosing the phone calls after Sines' possession of the property was placed at issue. Furthermore, we view the State's subsequent failure to object as nothing more than a candid recognition of the effect on the defense.

[43] The trial court found a mistrial was warranted by "the conduct of [Sines] who put his own self in jeopardy." Tr., Vol. 2 at 212. In the absence of compelling argument to the contrary and mindful that the trial court's determination of prosecutorial intent is "very persuasive[,]" *Wilson*, 697 N.E.2d at 473, we conclude the trial court's finding is not clearly erroneous. Therefore, a second trial did not violate constitutional prohibitions against double jeopardy.

# Conclusion

[44] For the reasons set forth above, we conclude the trial court did not abuse its discretion in admitting certain evidence and a second trial did not violate prohibitions against double jeopardy. Accordingly, we affirm.

[45] Affirmed.

Baker, J., and May, J., concur.